# MANDEVILLE ISLAND FARMS, INC. ET AL. v. AMERICAN CRYSTAL SUGAR CO.

No. 75.   Argued November 19, 1947.—Decided May 10, 1948.

*Stanley M. Arndt* argued the cause and *Guy Richards Crump* filed a brief for petitioners.

*Pierce Works* argued the cause for respondent. With him on the brief was *Louis W. Myers.*

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

The action is for treble damages incurred by virtue of alleged violation of the Sherman Act, §§ 1 and 2. 26 Stat. 209, 38 Stat. 731, 15 U. S. C. §§ 1, 2, 7, 15. The case comes here on certiorari, 331 U. S. 800, from affirmance by the Circuit Court of Appeals, 159 F. 2d 71, of a judgment of the District Court, 64 F. Supp. 265. That judgment dismissed the amended complaint as insufficient to state a cause of action arising under the Act. In this posture of the case, the legal issues are to be determined upon the allegations of the amended complaint.[1]

The main question is whether, in the circumstances pleaded, California sugar refiners who sell sugar in interstate commerce may agree among themselves to pay a uniform price for sugar beets grown in California without incurring liability to the local beetgrowers under the Act. Narrowly the question is whether the refiners' agreement

---

[1] The original complaint contained three counts, the first alleging violations of the Sherman Act and the second and third charging breach of contracts made in 1940 and 1941 respectively. In order to expedite decision and review upon the Sherman Act contention, by stipulation the amended complaint was filed setting forth, with an amendment to be noted, see note 5, only the allegations of the Sherman Act count. The stipulation provided for following this course without prejudice to further assertion by petitioners of rights under the two contract counts within a specified period following final determination of the Sherman Act issues.

together with the allegations made concerning its effects shows a conspiracy to monopolize and to restrain interstate trade and commerce or one thus affecting only purely local trade and commerce.

The material facts pleaded, which stand admitted as if they had been proved for the purposes of this proceeding, may be summarized as follows: Petitioners' farms are located in northern California, within the area lying north of the thirty-sixth parallel. The only practical market available to beet growers in that area was sale to one of three refiners.[2] Respondent was one of these. Each season growers contract with one of the refiners to grow beets and to sell their entire crops to the refiner under standard form contracts drawn by it. Since prior to 1939 petitioners have thus contracted with respondent.

The refiners control the supply of sugar beet seed. Both by virtue of this fact and by the terms of the contracts, the farmers are required to buy seed from the refiner. The seed can be planted only on land specifically covered by the contract. Any excess must be returned to the refiner in good order at the end of the planting season.

The standard contract gives the refiner the right to supervise the planting, cultivation, irrigation and harvest-

---

[2] It was alleged that the beets, when harvested, are "bulky and semi-perishable and incapable of being transported over long distances or of being stored cheaply or safely for any extended period. . . . when ripe, deteriorated rapidly if kept in the ground and not harvested, and it was necessary to harvest them promptly when matured."

There were also allegations that initial outlay, annual upkeep and operating expenses, and time required for erecting and equipping a refinery, were so great that no competition from any new refinery could be expected short of two years at best; that the three refiners had a monopoly in the area of the supply of seeds and of refining; and that no grower in the region could sell beets at a profit except to one of the three refiners.

ing of the beets, including the right to ascertain quality during growing and harvesting seasons by sampling and polarizing. Before delivering beets to the company, the farmers must make preliminary preparations for processing them into raw sugar.[3] The refiner has the option to reject beets if the contract conditions are not complied with and if the beets are not suitable in its judgment for the manufacture of sugar.

Prior to 1939 the contract fixed the grower's price by a formula combining two variables, a percentage of the refiner's net returns per hundred pounds from sales of sugar and the sugar content of the individual grower's beets determined according to the refiner's test.[4]

Sometime before the 1939 season the three refiners entered into an agreement to pay uniform prices for sugar beets. The mechanics of the price-fixing arrangement were simple. The refiners adopted identical form contracts and began to compute beet prices on the basis of the average net returns of all three rather than the separate returns of the purchasing refiner. Inevitably all would pay the same price for beets of the same quality.

Since the refiners controlled the seed supply and the only practical market for beets grown in northern California, when the new contracts were offered to the farmers, they had the choice of either signing or abandoning sugar beet farming. Petitioners accordingly contracted with respondent under this plan during the 1939, 1940 and 1941 seasons. The plan was discontinued after the 1941

---

[3] These include cutting off the beet tops, trimming the crowns in a specified way, and removing all foreign substances likely to interfere with factory work.

[4] Net returns from sugar sales were measured by gross sales price less selling expenses directly applicable to sugar. Monthly settlements were made for beets delivered during the preceding month on the estimated net returns of the refiner. But final settlement had to be deferred until the end of the season when net returns could be accurately determined.

season. Because beet prices were determined for the three seasons with reference to the combined returns of the three refiners, the prices received by petitioners for those seasons were lower than if respondent, the most efficient of the three, had based its prices on its separate returns.

The foregoing allegations set forth the essential features of the contractual arrangements between the refiners and the growers and of the agreement among the refiners themselves. Other allegations were made to complete the showing of violation and injury. They relate specifically to the peculiarly integrated character of the industry, effects of the arrangements upon interstate commerce, and the relation between the violations charged and the injuries suffered by petitioners.

With reference to the industry in general, it was stated that sugar beets were grown during the seasons 1938 to 1942 on large acreages not only in northern California but also in Utah, Colorado, Michigan, Idaho, Illinois and other states. The crops so grown, when harvested, were not "sold in central markets as were potatoes, onions, corn, grain, fruit and berries, but were produced by growers under contract with manufacturers or processors and immediately upon being harvested were delivered to these manufacturers and taken to their beet sugar refineries where the sugar beets were manufactured by an elaborate process into raw sugar by the said manufacturers, who thereafter sold the resulting sugar in interstate commerce." Then follow the allegations summarized above in note 2 concerning the bulky and semiperishable nature of sugar beets, the impossibility of transporting them over long distances or of storing them cheaply or safely, their rapid deterioration when ripe, and the necessity for prompt harvesting and marketing. These allegations must be taken as intended and effective to put the agreements complained of in the general setting of

the industry's unique structure and special mode of operation.

The specific allegation is added that the sugar manufactured by respondent and the other northern California refiners from beets grown in the region "was, during all of said period [1938 to 1942], sold in interstate commerce throughout the United States."

By way of legal as well as ultimate factual conclusions the amended complaint charged that respondent had unlawfully conspired with the other northern California refiners to "monopolize and restrain trade and commerce [5] among the several states and to unlawfully fix prices to be paid the growers . . . all in violation of the anti-trust laws . . ."; and that each refiner no longer competed against the others as to the price to be paid the growers, but paid the same price on the agreed uniform basis of average net returns.

There were further charges that prior to 1939 the northern California refiners had "competed in interstate commerce with each other as to the performance, ability and efficiency of their manufacturing, sales and executive departments, and each strove to increase sales return and decrease expenses," with the result that for 1938 respondent secured substantially greater "net gross receipts of sales of sugar" than the other refiners. These in turn were reflected in the payment of 29½ to 52½ cents per ton more to petitioners and other growers dealing with respondent than was paid by the other refiners to their growers.

---

[5] At this point the words "in sugar and sugar beets" appeared in the original complaint. They were stricken from the amended complaint by petitioners' counsel prior to dismissal of that complaint. Cf. note 1. This change however did not affect numerous other allegations remaining in the amended complaint concerning the combination's restrictive and monopolistic effects upon interstate trade in sugar. See note 6 and text; also note 24 and text Part IV *infra*.

However, for the seasons 1939, 1940 and 1941, under the new uniform contracts and prices, "there was no longer any such competition . . . ." Instead it was alleged upon information and belief that, as a result of the alleged conspiracy, respondent did not conduct its interstate operations as carefully and efficiently as previously or "as it would have had said conspiracy not existed." In consequence, respondent received less in sales returns for raw sugar and incurred greater expenses than if competition had been free, and petitioners "did not receive the reasonable value of their sugar beets."

Further charges were that as "a direct, expected and planned result of said conspiracy, the free and natural flow of commerce in interstate trade was intentionally hindered and obstructed," so that instead of the refiners "producing and selling raw sugar in interstate commerce . . . in competition with each other . . . they became illegally associated in a common plan wherein they pooled their receipts and expenses and frustrated the free enterprise system . . ."; all incentive to efficiency, economy and individual enterprise disappeared; and the refiners operated, "in so far as the growers were concerned," as if they were one corporation owning and controlling all factories in the area, but with three completely separated overheads and with none of the efficiency that consolidation into one corporation might bring.[6]

---

[6] Paragraph XIX of the amended complaint summarized petitioners' conclusions as follows: "By reason of the foregoing acts of the defendant and its said conspirators, *interstate commerce in sugar was illegally restrained, competition therein* was not only substantially lessened but *was destroyed,* the price of sugar beets was illegally fixed, and an illegal monopoly was established, all in violation of the anti-trust laws of the United States, to the damage of plaintiffs as aforesaid." (Emphasis added.) Cf. notes 5 and 24.

We are not concerned presently with the allegations relating to the injuries and amounts of damages inflicted upon petitioners,[7] except to say that they are sufficient to present those questions for support by proof, if the allegations made to show a cause of action arising under the statute are sufficient for that purpose.

In our judgment the amended complaint states a cause of action arising under the Sherman Act, §§ 1 and 2, and the complaint was improperly dismissed.

## I.

Broadly petitioners regard the entire sequence of growing the beets, refining them into sugar and distributing it, under the arrangements set forth, as a chain of events so integrated and taking place in interstate commerce or in such close and intimate connection with it that, for purposes of applying the Sherman Act, the complete sequence is an entirety and no part of it can be segregated from the remainder so as to put it beyond the statute's grasp.

Respondent, on the contrary, broadly severs the phase or phases of growing and selling beets from the later ones of refining them and of marketing the sugar. The initial growing process together with sale of the beets, and it would seem also the intermediate stage of refining, are taken to be "purely local," since all occurred entirely

---

[7] It is not clear whether damages were to be measured by the difference between the prices actually paid and those that would have been paid if based on respondent's separate returns, or by the difference between the prices paid and the prices set by the Secretary of Agriculture, pursuant to the Sugar Act of 1937, 50 Stat. 910, 7 U. S. C. § 1131 (d); see 5 Fed. Reg. 5231. But that is an issue that need not concern us now. Petitioner Mandeville Island Farms prayed judgment for $315,043.80; petitioner Zuckerman for $112,192.14.

within California; therefore were wholly intrastate events; and consequently were beyond the Sherman Act's reach.

Connected with this severance is the assertion that the complaint alleges no monopolistic or restrictive effects upon interstate commerce, but only such effects in the intrastate phases of the industry.

Much stress is laid upon the so-called interruption of the sequence at the refining stage. Prior to the interruption only beets are involved, afterward only sugar. Since the two commodities are different and all that affects the beets takes place in California, including the restraints alleged upon their sale, the trade and commerce in beets is wholly distinct from that in sugar and is entirely local, as are therefore the restraint and monopolization of that trade. Admittedly once the beets are converted into sugar and the sugar starts on its interstate journey to the tables of the nation, interstate commerce becomes involved. But only then is it affected, and nothing occurring before the journey begins or at any rate before the beets become sugar substantially affects or, for purposes of the statute's application, has relevance to that commerce.

Thus sugar together with its interstate sale and transportation is absolutely divorced from sugar beets, their production, sale and delivery to the refiner. Manufacture breaks the relationship and with it all consequences growing out of the restraints for the interstate processes and the purposes of the statute. In other words, since the restraints precede the interstate marketing of the sugar and immediately affect only the local marketing of the beets, they have no restrictive effect upon the trade and commerce in sugar.

This very nearly denies that sugar beets contain sugar. It certainly denies that the price of beets and restrictions upon it have any substantial relation in fact or in legal

significance for the statute's purposes to the price of sugar sold interstate, when the restrictions take place within the confines of a single state and before the interstate marketing process begins.

## II.

The broad form of respondent's argument cannot be accepted. It is a reversion to conceptions formerly held but no longer effective to restrict either Congress' power, *Wickard* v. *Filburn,* 317 U. S. 111, or the scope of the Sherman Act's coverage. The artificial and mechanical separation of "production" and "manufacturing" from "commerce," without regard to their economic continuity, the effects of the former two upon the latter, and the varying methods by which the several processes are organized, related and carried on in different industries or indeed within a single industry, no longer suffices to put either production or manufacturing and refining processes beyond reach of Congress' authority or of the statute.

It is true that the first decision under the Sherman Act applied those mechanical distinctions with substantially nullifying effects for coverage both of the power and of the Act. *United States* v. *E. C. Knight Co.,* 156 U. S. 1. Like this one, that case involved the refining and interstate distribution of sugar. But because the refining was done wholly within a single state, the case was held to be one involving "primarily" only "production" or "manufacturing," although the vast part of the sugar produced was sold and shipped interstate,[8] and this was the main end of the enterprise. The interstate distributing phase,

---

[8] It has been previously noted here that the Court applied these labels as a heritage from prior decisions under the commerce clause, dealing not as the *Knight* case with an act or acts of Congress, but with the validity of state statutes, *Wickard* v. *Filburn,* 317 U. S. 111, 121; *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 543–545, an approach reflecting Marshall's idea of the mutual

however, was regarded as being only "incidentally," "indirectly," or "remotely" involved; and to be "incidental," "indirect," or "remote" was to be, under the prevailing climate, beyond Congress' power to regulate, and hence outside the scope of the Sherman Act. See *Wickard* v. *Filburn, supra,* at 119 *et seq.*

The *Knight* decision made the statute a dead letter for more than a decade and, had its full force remained unmodified, the Act today would be a weak instrument, as would also the power of Congress, to reach evils in all the vast operations of our gigantic national industrial system antecedent to interstate sale and transportation of manufactured products. Indeed, it and succeeding decisions, embracing the same artificially drawn lines, produced a series of consequences for the exercise of national power over industry conducted on a national scale which the evolving nature of our industrialism foredoomed to reversal.[9]

---

exclusiveness of state and national power in this area and ignoring the later evolution of different conceptions in *Cooley* v. *Board of Wardens,* 12 How. 299. See *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 412–427.

[9] Compare, *e. g., United States* v. *E. C. Knight Co.,* 156 U. S. 1, with *Standard Oil Co.* v. *United States,* 221 U. S. 1, and *United States* v. *American Tobacco Co.,* 221 U. S. 106; *Hammer* v. *Dagenhart,* 247 U. S. 251, with *United States* v. *Darby,* 312 U. S. 100; *Carter* v. *Carter Coal Co.,* 298 U. S. 238, with *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381; *United States* v. *Chicago, etc., R. Co.,* 282 U. S. 311, and *Railroad Retirement Board* v. *Alton R. Co.,* 295 U. S. 330, with *United States* v. *Lowden,* 308 U. S. 225; *Hopkins* v. *United States,* 171 U. S. 578, with *Stafford* v. *Wallace,* 258 U. S. 495; *Employers' Liability Cases,* 207 U. S. 463, 498, with *Virginian R. Co.* v. *Federation,* 300 U. S. 515, 557, and *Weiss* v. *United States,* 308 U. S. 321; *New York Life Insurance Co.* v. *Deer Lodge County,* 231 U. S. 495 and authorities cited, with *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, and *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408.

We do not stop to review again in detail the familiar story of the progression of decision to that end, perhaps not told elsewhere more succinctly or pertinently than in *Wickard* v. *Filburn, supra*.[10] Suffice it to say that after coming back to life again in the *Northern Securities* case, 193 U. S. 197, for matters of transportation, the Sherman Act had a second rebirth in 1911 with the decisions in *Standard Oil Co.* v. *United States*, 221 U. S. 1, and *United States* v. *American Tobacco Co.*, 221 U. S. 106. Cf. *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 553 *et seq.*

Not thereafter could it be foretold with assurance that application of the labels of "production" and "manufacture," "incidental" and "indirect," would throw protective covering over those processes against the Act's consequences. Very soon also came the *Shreveport Rate Cases*, 234 U. S. 342, again in the field of transportation, but inevitably to add force and scope to the *Standard Oil* and *American Tobacco* rulings that manufacturing companies lay within the reach of the power and of the

---

[10] See particularly the discussion in 317 U. S. at 119–120. See also *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408; *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533; *Labor Board* v. *Jones & Laughlin*, 301 U. S. 1; *United States* v. *Darby*, 312 U. S. 100; *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110; Stern, The Commerce Clause and the National Economy, 1933–1946, 59 Harv. L. Rev. 645, 883.

The *Filburn* case dealt with the second Agricultural Adjustment Act and the power of Congress to enact it. But, referring to the first Interstate Commerce Act and the Sherman Act, the Court in the *Filburn* case (pp. 121–122) said that those statutes "ushered in new phases of adjudication" requiring a different approach to interpretation of the commerce clause, although "when it first dealt with this new legislation, the Court adhered to its earlier pronouncements, and allowed but little scope to the power of Congress." For the latter statement the *Knight* case was cited as the principal example.

statute, deriving no immunity for their conduct violative of the prohibitions merely from the fact of engaging in that character of activity.

With extension of the *Shreveport* influence to general application,[11] it was necessary no longer to search for some sharp point or line where interstate commerce ends and intrastate commerce begins, in order to decide whether Congress' commands were effective. For the essence of the affectation doctrine was that the exact location of this line made no difference, if the forbidden effects flowed across it to the injury of interstate commerce or to the hindrance or defeat of congressional policy regarding it.

The formulation of the *Shreveport* doctrine was a great turning point in the construction of the commerce clause, comparable in this respect to the landmark of *Cooley* v. *Board of Wardens,* 12 How. 299. For, while the latter gave play for state power to work in the field of commerce, the former broke bonds confining Congress' power and made it an effective instrument for fulfilling its purpose. The *Shreveport* doctrine cut Congress loose from the haltering labels of "production" and "manufacturing" and

---

[11] The doctrine encompassed fundamentally not merely an expanding factor in federal power over transportation. It was rather an integer in the sum of power over commerce, of which authority over transportation was but a part. The "affectation" approach was actually a revival of Marshall's "necessary and proper" doctrine, cf. *Wickard* v. *Filburn,* 317 U. S. 111, 120, 122, but unqualified by his idea of mutual exclusiveness, see note 8. Once applied to transportation and the Interstate Commerce Acts, it was inevitable that the approach would be extended to the productive and industrial phases of the national economy and the statutes regulating them, including the Sherman Act. Time and events were disclosing ever more clearly the impact of their effects upon interstate trade and commerce. And this was posing the same necessity for regulation as in the field of transportation, in order to protect and preserve the national commerce and carry out Congress' policy regarding it.

gave it rein to reach those processes when they were used to defy its purposes regarding interstate trade and commerce. In doing so the decision substituted judgment as to practical impeding effects upon that commerce for rubrics concerning its boundaries as the basic criterion of effective congressional action.

The transition, however, was neither smooth nor immediately complete, particularly for applying the Sherman Act. The old ideas persisted in specific applications as late as the 1930's. But after the historic decisions of 1911, and even more following the *Shreveport* decision, a constantly growing number of others rejected the idea that production and manufacturing are "purely local" and hence beyond the Act's compass, simply because those phases of a combination restraining or monopolizing trade were carried on within the confines of a single state or, of course, of several states.[12] The struggle for supremacy between the conflicting approaches was long continued. But more and more until the climax came in the late 1930's, this Court refused to decide those issues of power and coverage merely by asking whether the restraints or monopolistic practices, shown to have the forbidden effects on commerce, took place in a phase or phases of the total economic process which, apart from other phases and from the outlawed effects, occurred only in intrastate activities.[13]

---

[12] *United States* v. *Reading Co.*, 253 U. S. 26; *United States* v. *Keystone Watch Case Co.*, 218 F. 502; *Pennsylvania Sugar Refining Co.* v. *American Sugar Refining Co.*, 166 F. 254; *United States* v. *E. I. Du Pont de Nemours & Co.*, 188 F. 127. See Mr. Justice Holmes dissenting in *Hammer* v. *Dagenhart*, 247 U. S. 251, 279.

[13] *Montague & Co.* v. *Lowry*, 193 U. S. 38; *Swift & Co.* v. *United States*, 196 U. S. 375; *United States* v. *Patten*, 226 U. S. 525; *Binderup* v. *Pathe Exchange*, 263 U. S. 291; *Federal Trade Commission* v. *Pacific Paper Assn.*, 273 U. S. 52; *Stevens Co.* v. *Foster & Kleiser Co.*, 311 U. S. 255; *Bigelow* v. *RKO Radio Pictures*, 327 U. S. 251.

In view of this evolution, the inquiry whether the restraint occurs in one phase or another, interstate or intrastate, of the total economic process is now merely a preliminary step, except for those situations in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented.[14] For, given a restraint of the type forbidden by the Act, though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence. If so, the restraint must fall, and the injuries it inflicts upon others become remediable under the Act's prescribed methods, including the treble damage provision.

The *Shreveport* doctrine did not contemplate that restraints or burdens become or remain immune merely because they take place as events prior to the point in time when interstate commerce begins. Exactly the contrary is comprehended, for it is the effect upon that commerce, not the moment when its cause arises, which the doctrine was fashioned to reach.

Obviously therefore the criteria respondent would have us follow furnish no basis for reaching the result it seeks.

---

[14] In *United States* v. *Frankfort Distilleries,* 324 U. S. 293, 297, we said: "It is true that this Court has on occasion determined that local conduct could be insulated from the operation of the Anti-Trust laws on the basis of the purely local aims of a combination, insofar as those aims were not motivated by the purpose of restraining commerce, and where the means used to achieve the purpose did not directly touch upon interstate commerce." The decisions cited were *Industrial Association of San Francisco* v. *United States,* 268 U. S. 64; *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103; *United Leather Workers* v. *Herkert & Meisel Trunk Co.,* 265 U. S. 457; cf. *Local 167* v. *United States,* 291 U. S. 293, 297, and *United States* v. *Hutcheson,* 312 U. S. 219.

Only by returning to the *Knight* approach, and severing the intrastate events relating to the beets, including the price restraints, from the later events relating to the sugar, including its interstate sale, could we conclude there were no forbidden restraints or practices touching interstate commerce here. At this late day we are not willing to take that long backward step.

## III.

We turn then to consider the questions posed upon the amended complaint that are relevant under the presently controlling criteria. These are whether the allegations disclose a restraint and monopolistic practices of the types outlawed by the Sherman Act; whether, if so, those acts are shown to produce the forbidden effects upon commerce; and whether the effects create injury for which recovery of treble damages by the petitioners is authorized.

It is clear that the agreement is the sort of combination condemned by the Act,[15] even though the price-fixing was by purchasers,[16] and the persons specially injured under the treble damage claim are sellers, not customers or consumers.[17] And even if it is assumed that the final aim of the conspiracy was control of the local sugar beet market, it does not follow that it is outside the scope of the Sherman Act. For monopolization of local business, when achieved by restraining interstate commerce, is con-

---

[15] *United States* v. *Frankfort Distilleries,* 324 U. S. 293, and authorities cited.

[16] Cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150; *American Tobacco Co.* v. *United States,* 328 U. S. 781; *United States* v. *Patten,* 226 U. S. 525; *Swift & Co.* v. *United States,* 196 U. S. 375. Each case involved outlawed practices by persons who were both purchasers and sellers, and forbidden effects upon sellers as well as purchasers and consumers.

[17] See note 16.

demned by the Act. *Stevens Co.* v. *Foster & Kleiser,* 311 U. S. 255, 261. And a conspiracy with the ultimate object of fixing local retail prices is within the Act, if the means adopted for its accomplishment reach beyond the boundaries of one state. *United States* v. *Frankfort Distilleries,* 324 U. S. 293.

The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. Cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150; *American Tobacco Co.* v. *United States,* 328 U. S. 781. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated. Cf. *United States* v. *South-Eastern Underwriters Assn., supra,* at 553.

Nor is the amount of the nation's sugar industry which the California refiners control relevant, so long as control is exercised effectively in the area concerned, *Indiana Farmer's Guide* v. *Prairie Farmer,* 293 U. S. 268, 279, *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 225, the conspiracy being shown to affect interstate commerce adversely to Congress' policy. Congress' power to keep the interstate market free of goods produced under conditions inimical to the general welfare, *United States* v. *Darby,* 312 U. S. 100, 115, may be exercised in individual cases without showing any specific effect upon interstate commerce, *United States* v. *Walsh,* 331 U. S. 432, 437–438; it is enough that the individual activity when multiplied into a general practice is subject to federal control, *Wickard* v. *Filburn, supra,* or that it contains a threat to the interstate economy that requires preventive regulation. *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, 221–222.

Moreover, as we said in the *Frankfort Distilleries* case, ". . . there is an obvious distinction to be drawn between

a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states." 324 U. S. 293, 297. That statement is as true of the situation now presented as of the one then before us, although instead of restraining trade in order to control a local market petitioners control a local market in which they purchase. For this is not a case involving only "a course of conduct wholly within a state"; it is rather one involving "conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states," and in such a case it is not material that the source of the forbidden effects upon that commerce arises in one phase or another of that program.

In view of all this, it is difficult to understand respondent's argument that the complaint does not allege that the conspiracy had any effect on interstate commerce, except on the basis of the discarded criteria discussed in Part II above. The contention ignores specific allegations which we have set forth. But apart from that fact it rests only on a single grounding, which in the circumstances of this case is little, if any, more than a different phrasing of the criteria supplanted by the *Shreveport* approach.

This is that the change undergone in the manufacturing stage when the beets are converted into sugar makes the case different, for the Sherman Act's objects, than it would be if the identical commodity were concerned from the planting stage through the phase of interstate distribution, *e. g.*, if the commodity were wheat, as was true in *Wickard* v. *Filburn, supra,* or raisins purchased by packers from growers and shipped interstate after packing, cf. *Parker* v. *Brown,* 317 U. S. 341, 350.

We do not stop to consider specific and varied situations in which a change of form amounting to one in the essential character of the commodity takes place by manufacturing or processing intermediate the stages of producing and disposing of the raw material intrastate and later interstate distribution of the finished product; or the effects, if any, of such a change in particular situations unlike the one now presented.[18] For mere change in the form of the commodity or even complete change in essential quality by intermediate refining, processing or manufacturing does not defeat application of the statute to practices occurring either during those processes or before they begin, when they have the effects forbidden by the Act.[19] Again, as we have said, the vital thing is the effect on commerce, not the precise point at which the restraint occurs or begins to take effect in a scheme as closely knit as this in all phases of the industry. Hence in this case the mere fact that the price fixing related directly to the beets did not sever or render insubstantial its effect subsequently in the sale of sugar.

Indeed that severance would not necessarily take place if the manufacturing stage had produced a much greater change in commodities than was effected here. But under the facts characterizing this industry's operation and the tightening of controls in this producing area by the new agreements and understandings, there can be no question that their restrictive consequences were projected substantially into the interstate distribution of the sugar, as the amended complaint repeatedly alleges. Indeed

[18] Compare *Arkadelphia Milling Co.* v. *St. Louis Southwestern R. Co.,* 249 U. S. 134, with *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148.

[19] *Swift & Co.* v. *United States,* 196 U. S. 375; *American Tobacco Co.* v. *United States,* 328 U. S. 781; *United States* v. *Aluminum Co. of America,* 148 F. 2d 416.

they permeated the entire structure of the industry in all its phases, intrastate and interstate.

We deal here, as petitioners say, with an industry tightly interwoven from sale of the seed through all the intermediate stages to and including interstate sale and distribution of the sugar. In the middle of all these processes and dominating all of them stand the refiners. They control the supply and price of seed, the quantity sold and the volume of land planted, the processes of cultivation and harvesting, the quantity of beets purchased and rejected, the refining, and the distribution of sugar both interstate and local.

Some of these controls have been built up by taking advantage of the opportunities afforded by the industry's unique character, both natural and in its general pattern and habits of organization; [20] others by utilizing the key positions these advantages give the refiners to put contractual restraints upon the growers by their separate actions; [21] and still greater ones by the refiners' ability,

---

[20] The natural factors include the peculiar nature of the crop in its limitation to a single primary and commercially profitable use, the necessity for immediate and nearby marketing to follow directly upon harvesting, and the well-known fact that sugar beets are grown only in widely scattered regions specially adapted to the crop in soil, climate and availability of water in large quantities during the growing season.

[21] Resulting in large part from the natural limitations stated in note 20 and the fact that extracting the sugar content from the beets is an elaborate and technical process, is the further important fact that the processing cannot be done by the growers individually or even in small cooperative groups, but requires specialized and large-scale business organization, equipment and investment. All these factors and perhaps others combine to make the refining stage of the industry a specialized manufacturing one to be carried on separately from growing, to establish the refiners' key place in the entire industry, and thus to leave the growers completely at the refiners' mercy for the profitable production of beets except as the latter may compete among themselves.

by virtue of their central and dominating place thus achieved, to agree among themselves upon further restrictions.

Even without the uniform price provision and with full competition among the three refiners, their position is a dominating one. The growers' only competitive outlet is the one which exists when the refiners compete among themselves. There is no other market. The farmers' only alternative to dealing with one of the three refiners is to stop growing beets. They can neither plant nor sell except at the refiners' pleasure and on their terms. The refiners thus effectively control the quantity of beets grown, harvested and marketed, and consequently of sugar sold from the area in interstate commerce, even when they compete with each other. They dominate the entire industry. And their dominant position, together with the obstacles created by the necessity for large capital investment and the time required to make it productive, makes outlet through new competition practically impossible. Upon the allegations, it is absolutely so for any single growing season. A tighter or more all-inclusive monopolistic position hardly can be conceived.

When therefore the refiners cease entirely to compete with each other in all stages of the industry prior to marketing the sugar, the last vestige of local competition is removed and with it the only competitive opportunity for the grower to market his product. Moreover it is inconceivable that the monopoly so created will have no effects for the lessening of competition in the later interstate phases of the over-all activity or that the effects in those phases will have no repercussions upon the prior ones, including the price received by the growers.

There were indeed two distinct effects flowing from the agreement for paying uniform growers' prices, one immediately upon the price received by the grower rendering

it devoid of all competitive influence in amount; the other, the necessary and inevitable effect of that agreement, in the setting of the industry as a whole, to reduce competition in the interstate distribution of sugar.

The idea that stabilization of prices paid for the only raw material consumed in an industry has no influence · toward reducing competition in the distribution of the finished product, in an integrated industry such as this, is impossible to accept. By their agreement the combination of refiners acquired not only a monopoly of the raw material but also and thereby control of the quantity of sugar manufactured, sold and shipped interstate from the northern California producing area. In substance and roughly, if not precisely, they allocated among themselves the market for California beets substantially upon the basis of quotas competitively established among them at the time the uniform price arrangement was agreed upon. It is hardly likely that any refiner would have entered into an agreement with its only competitors, the effect of which would have been to drive away its growers, or therefore that many of the latter would have good reason to shift their dealings within the closed circle. Thus control of quantity in the interstate market was enhanced.

This effect was further magnified by the fact that the widely scattered location of sugar beet growing regions and their different accessibilities to market [22] give the refiners of each region certainly some advantage over growers and refiners in other regions, and undoubtedly large ones over those most distant from the segment of the interstate market served by reason of being nearest to hand.

Finally, the interdependence and inextricable relationship between the interstate and the intrastate effects

---

[22] See note 20.

of the combination and monopoly are shown perhaps most clearly by the provision of the uniform price agreement which ties in the price paid for beets with the price received for sugar. The percentage factor of interstate receipts from sugar which the grower's contract specifies shall enter his price for beets makes that price dependent upon the price of sugar sold interstate. The uniform agreement's effect, when added to this, is to deprive the grower of the advantage of the individual efficiency of the refiner with which he deals, in this case the most efficient of the three, and of the price that refiner receives. It is also to reflect in the grower's price the consequences of the combination's effects for reducing competition among the refiners in the interstate distribution of sugar.

In sum, the restraint and its monopolistic effects were reflected throughout each stage of the industry, permeating its entire structure. This was the necessary and inevitable effect of the agreement among the refiners to pay uniform prices for beets, in the circumstances of this case. Those monopolistic effects not only deprived the beet growers of any competitive opportunity for disposing of their crops by the immediate operation of the uniform price provision; they also tended to increase control over the quantity of sugar sold interstate; and finally by the tie-in provision they interlaced those interstate effects with the price paid for the beets.

These restrictive and monopolistic effects, resulting necessarily from the practices allegedly intended to produce them, fall squarely within the Sherman Act's prohibitions, creating the very injuries they were designed to prevent, both to the public and to private individuals.

It does not matter, contrary to respondent's view, that the growers contracting with the other two refiners may have been benefited, rather than harmed, by the combi-

nation's effects, even if that result is assumed to have followed. It is enough that these petitioners have suffered the injuries for which the statutory remedy is afforded. For the test of the legality and immunity of such a combination, in view of the statute's policy, is not that some others than the members of the combination have profited by its operation. It is rather whether the statute's policy has been violated in a manner to produce the general consequences it forbids for the public and the special consequences for particular individuals essential to the recovery of treble damages. Both types of injury are present in this case, for in addition to the restraints put upon the public interest in the interstate sale of sugar, enhancing the refiner's controls, there are special injuries affecting the petitioners resulting from those effects as well as from the immediate operation of the uniform price arrangement itself.

The fact that that arrangement is the source of both effects cannot be taken to mean that neither is outlawed by the statute, in view of their interdependence and the completely unified and comprehensive nature of the scheme as respects its interstate and intrastate phases. The policy of the Act is competition. It cannot be flouted, as has been done here, by artificial nomenclatural severance of the plan's forbidden effects, any more than by such a segmentation of the integrated industry into legally unrelated phases. Nor can the severance be made in such a case merely by virtue of the fact that a refining or manufacturing process constitutes an intermediate stage in the whole.

To compare an industry so completely interlocked in all its stages, by all-inclusive contract as well as by industrial structure and organization, with one like producing, processing, and marketing fruits, vegetables, corn, or other products, susceptible of various uses and under con-

ditions affording varied outlets for market, both local and interstate, in the raw or refined state, in which neither such a contractual nor such an industrial integration exists, is to ignore the facts of industrial life. So is it also to make conclusive comparisons with other industries in which the manufacturing process requires and has available a greater variety of raw materials for making the finished product, and involves a longer and more extensive process of change, than does extracting the sugar content of beets to make raw sugar.

We deal with the facts before us. With respect to others which may be significantly different, for purposes of violating the statute's terms and policy, we await another day.[23]

## IV.

Little more remains to be said concerning the amended complaint. The allegations comprehend all that we have set forth. We do not stop to restate them, leaving their substance at this point for reference to the summary made at the beginning of this opinion.

Respondent has presented its argument as if the amended complaint omitted all reference to restraint or effects upon interstate trade in sugar and confined these allegations to the trade in beets. It is true that at the

---

[23] It is suggested that *Parker* v. *Brown,* 317 U. S. 341, is inconsistent with our conclusion here. The Court there held first that the Sherman Act did not apply because the program was sponsored by the State of California. Contrary to the present suggestion, the opinion assumes that the relation between the intrastate and the interstate commerce in raisins was sufficient to justify federal regulation, if the state-sponsored program of prorating had been "organized and made effective solely by virtue of a contract, combination or conspiracy of private persons, individual or corporate." 317 U. S. at 350. The case therefore contains no suggestion, on the facts or on the law, contrary to the result now reached.

hearing which followed filing of the amended complaint, petitioners at one point, apparently in response to some intimation from the court, eliminated the words "sugar and sugar beets" from one of the allegations that the refiners had conspired to "monopolize and restrain trade and commerce among the several states . . . ." [24]

Respondent takes this elision as effective to constitute an express disavowal by petitioners of any charge of restraint of trade in sugar, the only interstate commodity.

---

[24] See note 5. By way of explaining the deletion, the record contains only the statement of the stipulation, cf. note 1, that the amended complaint eliminated "what the Court considered an ambiguity in the [original] complaint." With no further support from the record, it has been assumed that the ambiguity so elided was the reference to restraint of interstate trade in *sugar* and hence the petitioners in making it stated themselves out of court.

Apart from the fact that the elision did not affect numerous other like allegations, see note 6 and text, the deletion included the specifications of both "sugar and sugar beets." From this the literal inference, if any of the sort could be made, would be that the elision was intended to withdraw all charges of monopoly or restraint of trade, whether in sugar or in beets, and thus to concede there was no case under the Sherman Act, a conclusion obviously at war with the remaining allegations of restraint of trade in both sugar and sugar beets.

But, if any difference between the two could be assumed as having been intended, it is much more likely that the supposed ambiguity deleted arose from the reference to interstate trade in *beets*, since the allegation as a whole referred only to "interstate trade and commerce" and on the facts pleaded the only trade in beets was intrastate (considered apart, as respondent would do, from its relation to and effects upon the trade in sugar).

In any event the case is to be decided upon the sum of the allegations of the amended complaint, not upon conjecture as to why a particular and, we think, immaterial amendment of one allegation was made. Indeed the entire allegation could have been elided without affecting the substance or validity of the remainder of the amended complaint to state a cause of action under the Sherman Act. There was more than enough without it.

The amendment did not eliminate or affect numerous other allegations which in effect repeated the charge in various forms and with reference to various specific effects upon interstate as well as local phases of the commerce. Some of these explicitly specified trade or commerce in sugar,[25] others designated the trade affected as interstate, which on the facts could mean only sugar. Moreover, petitioners deny the disavowal, both in intent and in effect. They say the elision was insubstantial, since in the clause from which it was made the allegation of conspiracy to monopolize and restrain interstate commerce remained, and the only interstate trade was in sugar. We think the amendment, for whatever reason made, was not effective to constitute a disavowal, disclaimer or waiver.

The allegations are comprehensive and, for the greater part, specific concerning both the restraints and their effects. They clearly state a cause of action under the Sherman Act.

The judgment of the Circuit Court of Appeals is reversed, and the cause is remanded to the District Court for further proceedings in conformity with this opinion.

*Reversed and remanded.*

MR. JUSTICE JACKSON, with whom MR. JUSTICE FRANK-FURTER joins, dissenting.

It appears to me that the Court's opinion is based on assumptions of fact which the petitioner disclaimed in the court below. These assumptions are permissible inferences from the amended complaint only if we disregard the way in which the amendments came about.

---

[25] *E. g.*, in the allegation quoted in note 6, as well as others set forth in the text preceding that note.

On hearing, the trial judge apparently considered that a cause of action would be stated only if the complaint alleged that the growing contracts affected the price of sugar in interstate commerce. But the contracts accompanying the pleadings indicated that the effects ran in the other direction. The market price of interstate sugar was the base on which the price of beets was to be figured. The latter price was derived from the income which respondent and others received from sugar sold in the open market over the period of a year. The trial judge therefore suggested that the references to restraint of trade in sugar in interstate commerce created an ambiguity in the complaint. Accordingly, the plaintiff, at the suggestion of the court and for the specific purpose of this appeal, filed an amended complaint which completely eliminated the charge that the agreements complained of affected the price of sugar in interstate commerce, and eliminated the two other counts "to enable the Court herein to pass upon the sufficiency of the first count on its merits and, further, to make possible a speedy and inexpensive review by appeal if the Court held that the first count was insufficient."[1] The District Court then held that since no beets

---

[1] The full text of the Stipulation and Order which was executed by counsel for both parties, and by the District Judge, is as follows:

"Whereas, in oral argument on November 13, 1945, on the motion of defendant to dismiss, etc., Hon. Ben Harrison, the United States District Judge before whom said matter was argued, stated from the bench to counsel herein that he felt that the first cause of action, if supplemented by copies of the contracts attached to the defendant's motion to dismiss, would not state facts sufficient to constitute a cause of action, and suggested that it would be a tremendous saving of time and expense if the complaint were amended (a) by setting forth copies of the agreements involved in the first count, (b) by eliminating what the Court considered an ambiguity in the complaint, and (c) by the parties entering into a stipulation to eliminate from the pleadings, for the purpose of the appeal only and without prejudice

whatever moved in interstate commerce and since there was no charge in the amended complaint that the cost or quality of the product which did move in interstate commerce was in any way affected, no cause of action was

to the rights of the plaintiffs, the second and third causes of action, so as to enable the Court herein to pass upon the sufficiency of the first count on its merits and, further, to make possible a speedy and inexpensive review by appeal if the Court held that the first count was insufficient;

"Now, Wherefore, the parties stipulate, without plaintiffs' waiving their rights under the second and third counts and without prejudice to any of plaintiffs' rights thereunder, as follows, to-wit:

"1. Plaintiffs will file an amended complaint herein, attaching copies of the forms of contract in use in 1938, 1939, 1940 and 1941, and omitting the second and third counts.

"2. Said omission of the said second and third counts shall be without prejudice to any of the rights of the plaintiffs as to any cause or causes of action included or includible therein by amendment, and shall not be a retraxit or a dismissal with prejudice.

"3. Defendant herein waives, for the period of time hereinafter set forth, any and all statutes of limitations now or hereafter applicable to the second or third causes of action or any matters therein set forth or includible therein by amendment, and waives the defense of laches as to the second and third causes of action or any matters therein set forth or includible therein by amendment.

"4. Plaintiffs may, at any time prior to six months after the decision on appeal as to the sufficiency of the first count has become final, either amend the amended complaint herein by realleging said second and third counts or any portion of either, or, at any time during said period, file a separate action or actions setting forth said second and third counts or any portion of either, all with the same force and effect as if said second and third counts were continuously included herein as second and third counts from the date of the commencement of this action.

"5. The waiver of the statute of limitations and of the defense of laches herein set forth, and the stipulation permitting the amendment of the amended complaint or the filing of a separate action or actions hereinabove set forth, shall continue until six months after the determination on appeal as to the sufficiency of the first count has become final."

stated. The appeal was taken and the Circuit Court of Appeals affirmed.

This Court, however, decides the case as though the original complaint as it related to sugar had not only remained unchanged but had been proved by evidence. Despite the deletion from the complaint of the allegation concerning the price of sugar, the Court assumes, without allegation or evidence, that the price of sugar is affected and on that basis builds its thesis that the Sherman Act has been violated. I think in fairness to the litigants and the District Court, the petitioner's case should be disposed of here on the same basis on which it was pleaded to the courts below.

On the proceedings in the courts below, I would affirm the judgment of the District Court.