The ATCHISON, TOPEKA AND SANTA
FE RAILWAY COMPANY, et
al., Petitioners,

v.

The UNITED STATES of America and
the Interstate Commerce Commission,
Respondents.

No. 78–2044.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 6, 1978.

Decided April 26, 1979.

As Amended May 3, 1979.

Howard J. Trienens, Chicago, Ill., for petitioners.

**1.** This Court has jurisdiction to review the
Commission's order under 49 U.S.C. § 10327
which provides in part:

   "(i) Notwithstanding this subtitle, an action of the Commission under this section

Frederick W. Read, III, Interstate Commerce Commission, Robert Lewis Thompson, Dept. of Justice, Washington, D.C., for respondents.

Before FAIRCHILD, Chief Circuit Judge, and TONE and BAUER, Circuit Judges.

BAUER, Circuit Judge.

This is a petition for review of an order of the Interstate Commerce Commission issued on July 19, 1978. The petitioners are forty railroads who are members of the Western Traffic Association, the Southern Freight Association and the Traffic Executive Association-Eastern Railroads. The sole issue presented for review is whether the Commission erred in concluding that it lacks jurisdiction under 49 U.S.C. § 5c, the Interstate Commerce Act, to approve agreements among railroads on intrastate rates that affect interstate commerce, and thereby to exempt such agreements from the operation of the antitrust laws.[1]

In determining whether the Commission has authority to approve antitrust immunity for such agreements we must begin with the statutory language itself. Section 5c(2) of the Act provides in pertinent part:

   "Any carrier which is a party to an agreement, between or among two or more carriers, relating to rates, fares, classifications, divisions, allowances, or charges (including charges between carriers and compensation paid or received for the use of facilities and equipment), or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation, or establishment thereof, shall, under such rules and regulations as the Commission shall prescribe, apply to the Commission for approval of such agreement. The Commission shall, by order, approve any such agreement if approval thereof is not prohibited by paragraph (4) or (5) of this section and if it finds that,

by reason of furtherance of the national transportation policy declared in this Act, the relief provided in paragraph (8) of this section should apply with respect to the making and carrying out of such agreement; otherwise the application shall be denied. . . ." 49 U.S.C. § 5c(2).

Section 5c(8) provides that "[p]arties to any agreement approved by the Commission under this section . . . are . . . relieved from the operation of the antitrust laws with respect to the making of such agreement . . . ."

We note first that the language of § 5c(2)—which refers only to an "agreement . . . relating to rates"—does not expressly include or exclude agreements on intrastate rates affecting interstate commerce. Accordingly, we must look to the congressional purpose underlying the provisions at issue in an effort to resolve the ambiguity.

Section 5c was added to the Interstate Commerce Act in 1948 as part of the Reed-Bulwinkle Act. The Senate report on the Reed-Bulwinkle Act described the purpose of that legislation as follows:

"In recent years, questions have arisen concerning the nature and extent of cooperation among carriers which is permissible under the antitrust laws. As a result, a state of confusion has developed which menaces long-standing practices in the field of transportation, proven over the years to be highly satisfactory to shippers and carriers alike and also to governmental agencies charged with regulatory duties.

2. Similarly, the Senate Report on the Railroad Revitalization Reform Act of 1976 described the congressional concerns that led to the passage of Section 5c as follows:

"The confusion, uncertainties and inconsistencies became matters of national concern as a result of a series of actions commenced by the Department of Justice beginning in 1941 which questioned the cooperative activities of the railroads carried on through rate bureaus. Congress was faced with the duty of harmonizing and reconciling the policy of the antitrust laws as applicable to common carriers with the national transportation policy which seeks the mainte-

A question of policy for Congress is therefore presented and it is the plain duty of Congress to take the necessary remedial steps for the purpose of harmonizing and reconciling the policy of the antitrust laws, as applicable to common carriers, with the national transportation policy in such a manner as to protect the public interest." S.Rep.No. 44, 80th Cong., 1st Sess. 3 (1947), see also H.Rep.No. 1100, 80th Cong., 1st Sess. 4 (1947); U.S.Code Cong.Serv.1948, p. 1844.

Thus, the central purpose of section 5c was "to bring about an accommodation" of the antitrust and national transportation policies.[2] This is particularly significant in view of the fact that the Supreme Court has construed the Sherman Act to apply to intrastate conduct affecting interstate commerce. See, e. g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). Accordingly, under the Commission's reading of the statute, the scope of its jurisdiction to immunize railroad rate agreements from the effect of the antitrust laws is less extensive than the antitrust laws themselves. In our view, the creation of such a regulatory gap cannot be squared with the congressional purpose of "reconciling" the antitrust laws with the national transportation policy.

Nevertheless, the Commission found that its jurisdiction over intrastate rates was limited by Section 1(2)(a) of the Act which provides:

nance of a transportation system which provides service to the public with reasonable charges and without unjust discrimination or unfair or destructive competitive practices. A large measure of cooperation and collective action by and among common carriers is necessary if the national transportation [policy] is to be effectuated and the public is to receive the kind of transportation service to which it is entitled and if the rates are to be reasonable and nondiscriminatory." S.Rep.No. 94–499, 94th Cong., 1st Sess. 14 (1975), U.S.Code Cong. & Admin.News 1976, pp. 14, 28.

"The provisions of this chapter . . shall not apply—

(a) [t]o the transportation of passengers or property, or to the receiving, delivering, storage, or handling of property, wholly within one State and not shipped to or from a foreign country from or to any place in the United States as aforesaid, except as otherwise provided in this chapter."

In the so-called *Shreveport* case (234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341) however, the Supreme Court held that Section 1(2) did not limit the Commission's jurisdiction over intrastate rates affecting interstate commerce:

"The Commission was dealing with the relation of rates injuriously affecting, through an unreasonable discrimination, traffic that was interstate. The question was thus not simply one of transportation that was 'wholly within one state.' These words of [Section 1] have appropriate reference to *exclusively intrastate traffic, separately considered; to the regulation of domestic commerce, as such.* The powers conferred by the act are not thereby limited where interstate commerce itself is *involved.*" *Houston, E. & W. T. R. Co. v. United States,* 234 U.S. 342, 358, 34 S.Ct. 833, 839, 58 L.Ed. 1341 (1914) (emphasis supplied).

The Court thus concluded that "there is no basis for the contention that Congress intended to exempt any discriminatory action or practice of interstate carriers affecting interstate commerce which it had authority to reach." *Id.* at 356, 34 S.Ct. at 838.

While the *Shreveport* case dealt with *discriminatory* intrastate rates under Section 3 of the Act, there is no reason to thus limit its application.[3] Indeed, in *Mandeville Island Farms, Inc. v. American Crystal Sugar Co., supra,* the Supreme Court relied on a broad reading of the *Shreveport* decision in construing the antitrust laws to reach intrastate conduct affecting interstate commerce:

"With extension of the *Shreveport* influence to *general application,* it was necessary no longer to search for some sharp point or line where interstate commerce ends and intrastate commerce begins, in order to decide whether Congress' commands were effective. *For the essence of the affectation doctrine was that the exact location of this line made no difference, if the forbidden effects flowed across it to the injury of interstate commerce or to the hindrance or defeat of congressional policy regarding it.*" 334 U.S. at 232, 68 S.Ct. at 1004 (emphasis supplied).

In this connection, however, the Commission argues that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973). But the regulatory statute in this case has expressly provided for immunity from the antitrust laws. The only question, therefore, is whether agreements among railroads on intrastate rates which affect interstate commerce fall within the Commission's jurisdiction and are thus subject to the express immunity. As noted above, it is our conclusion that the congressional purpose of reconciling the antitrust laws with the national transportation policy can be fully realized only if § 5c is construed to give the Commission the authority to grant antitrust immunity for agreements on intrastate rates that affect interstate commerce.

---

3. The Commission claims that *Shreveport* sanctioned only a regulatory authority over discriminatory intrastate rates. It also argues that because § 13(4) of the Act expressly confers jurisdiction over such rates, the absence of a similar specific reference in § 5c implies that its authority over intrastate rates is narrowly limited. However, as noted above, we decline to adopt such a narrow reading of the *Shreveport* decision, since it appears to conflict with the congressional purpose of "reconciling" the antitrust laws with the national transportation policy.

The Commission argues that its authority to regulate the level of intrastate rates is limited[4] and that it should not have power to immunize activity over which it does not have plenary control. The Commission is not asked to approve rates, however, but agreements. Section 5c gives it authority to determine whether an agreement submitted for approval is in "furtherance of the national transportation policy" and to disapprove it if it is not. Moreover, antitrust immunity exists only if the agreement is carried out in conformity with its terms and with "the terms and conditions prescribed by the Commission." 49 U.S.C. § 5c(8); *Ex Parte No. 297, Rate Bureau Investigation*, 349 I.C.C. 811, 824 (1975).

In point is *Atchison, Topeka & Santa Fe Railway v. Aircoach Transportation Association*, 102 U.S.App.D.C. 355, 253 F.2d 877 (1958), *cert. denied*, 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354 (1960). That case involved an alleged price fixing conspiracy by railroads with respect to § 22 rates, *i. e.*, special rates applicable to government traffic. Even though the Commission lacked power to set such rates, they were within the provision that is now § 5c, the Court held. Although distinctions may be drawn between § 22 rates and intrastate rates affecting interstate commerce, the *Aircoach* case stands for the proposition that the absence of plenary power over particular rates does not necessarily exclude them from the coverage of § 5c.

Accordingly, we set aside the Commission's determination that it lacks jurisdiction in this matter and remand the case for further proceedings consistent with this opinion.

Remanded.

---

4. The Commission has authority under § 13(4) of the Act to reset intrastate rates to the extent necessary to remove any "advantage" or "preference" in favor of the intrastate rate or "prejudice, discrimination, or burden" upon interstate commerce. Any shortfall between this power and plenary power over those intrastate rates that affect interstate commerce appears to be largely theoretical, especially in view of the plenary power of the state regulatory agencies over rate levels. To the extent that the Commission may lack power under § 13(4) to regulate rate levels, state agencies have plenary power and it cannot be assumed that they would allow unreasonably high intrastate rates to stand.