**SAVON GAS STATIONS NO. 6, INC., a Maryland corporation,**

and

**A. & H. Transportation, Inc., a Maryland corporation,**

v.

**SHELL OIL COMPANY.**

Civ. A. No. 13374.

United States District Court
D. Maryland.

March 14, 1962.

Lawrence I. Weisman, David M. Blum, Baltimore, Md., for plaintiffs.

William Simon, James T. Reilly, Washington, D. C., for defendant.

WINTER, District Judge.

Defendant has moved for summary judgment upon the two count complaint filed against it to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, for violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and to recover damages and obtain injunctive relief under Maryland common law.

The dispute between the parties arises out of a lease, dated October 13, 1954, entered into between the defendant and the owners of the Middlesex Shopping Center (hereafter called Middlesex). Middlesex occupies a portion of the triangular area in Baltimore City bounded by Eastern Boulevard, Essex Avenue and Marlyn Avenue. The lease required the owners of Middlesex to construct a gasoline service station for defendant, and, *inter alia*, contained the covenant, designated as Article 1A:

> "Lessor [Middlesex] covenants and agrees that, throughout the term of this lease or any extension thereof, Lessor will not use or permit the use of other property belonging to, acquired, or controlled by Lessor or Lessor's principal stockholders, and situated in the area bounded by Eastern Boulevard, Essex Avenue, and Marlyn Avenue, for the purpose of a gasoline service station, or similar enterprise, which would compete with the business of Shell being conducted on the premises."

Defendant's service station was constructed pursuant to the lease and opened for business in 1954.

The lease was promptly recorded among the Land Records of Baltimore County. Under date of July 23, 1956, plaintiffs acquired a long-term lease on a parcel of property fronting on Eastern Boulevard and immediately adjacent to Mid-

dlesex for the purpose of maintaining and operating another competing gasoline service station. Plaintiffs' service station was opened for business on August 31, 1956. Plaintiffs' station was constructed by the principals of Middlesex pursuant to an alleged oral agreement in regard to a right-of-way in such manner that the patrons of Middlesex, and particularly those motorists who parked in the parking area which was a part of Middlesex, could enter plaintiffs' station without the necessity of driving from the parking area to Eastern Boulevard, and from Eastern Boulevard to plaintiffs' station. Conversely, patrons of plaintiffs' station could also leave plaintiffs' station by driving onto the Middlesex area without the necessity of first driving onto Eastern Boulevard.

After plaintiffs' station had begun operations, defendant, under date of October 19, 1956, wrote to the owners of Middlesex stating that defendant was aware that " * * * certain of your lands are being used for entrance into a service station built and owned by another oil company," and that " * * * such use is violative of the restrictive covenant of Article 1A of the lease with us," and, further, that " * * * we trust you will immediately explore this matter with your attorneys and initiate such action as they suggest will leave you in full conformance with the legal and moral obligations which you have assumed."

Promptly after receipt of this letter, the owners of Middlesex erected a barrier between the parking area of Middlesex and the rear entrance of plaintiffs' station. The original barrier, constructed of individual wooden posts, was removed by plaintiffs' employees almost as rapidly as it was erected. Later, a concrete barrier, in the nature of curbing, was erected and, apparently after some question as to whether the curbing had been placed along the common line or upon plaintiffs' lands, a second concrete curbing was put in place.

Plaintiffs allege that the presence of these three barriers effectively prevented the movement of automobiles between the parking area of Middlesex and the contiguous area of plaintiffs' station, other than via Eastern Boulevard, and that plaintiffs' sales of gasoline and related products sharply diminished.

In the first count of the complaint, plaintiffs allege that they and defendant are engaged in price competition and that defendant " * * * commenced and continued a series of concerted actions carried out through oral communications and correspondence addressed to the operators of Middlesex Shopping Center and others, which concerted action was designed to prevent the use of the subject right-of-way by the customers and patrons of the Middlesex Shopping Center over the land of the plaintiffs" (¶18). Further, plaintiffs allege that the lease between defendant and Middlesex " * * contained an unreasonable restraint of trade" by the inclusion of the restrictive covenant set forth above, and that defendant " * * * allegedly purporting to rely upon said inapplicable and unreasonable restrictive covenant, but in fact seeking to destroy Plaintiffs and eliminate price competition offered to Shell by Plaintiffs" (¶19) procured the operators of Middlesex to erect barriers along the common line and has in fact destroyed price competition between the defendant and the plaintiffs in the sale of gasoline and petroleum products (¶20). Specifically, plaintiffs allege that the foregoing constitute a conspiracy between defendant and owners of Middlesex to restrain plaintiffs' trade and commerce (¶21).

In count 2, plaintiffs repeat all of the allegations contained in count 1, and make the further allegation that the "wrongful and unlawful" acts of the defendant maliciously, illegally and unlawfully interfered with the advantageous relationships and contractual rights of the plaintiffs, in violation of the common law of the State of Maryland.

In its motion for summary judgment, or, in the alternative, to dismiss the complaint, defendant maintains that the obtention of the restrictive covenant was not in violation of the Sherman Act, nor

was its enforcement, that the restrictive covenant was valid under Maryland law, and that, in any event, plaintiffs' cause of action, if any, is barred by the federal antitrust statute of limitations, contained in Section 4B of the Clayton Act, 15 U.S.C.A. § 15b as to count 1, and the statute of limitations contained in Section 1 of Article 57 of the Annotated Code of Maryland as to count 2. In making these contentions, defendant asserts that no case has held that a restrictive covenant of the type set forth above violates the Sherman Act, that the restrictive covenant from which the dispute arises is not a covenant which was obtained "in interstate commerce," and the effect of the covenant on interstate commerce is not sufficiently substantial to bring the federal antitrust statutes into play. Additionally, defendant contends that the validity and enforceability of the restrictive covenant is well-settled by the Maryland law. The Court has before it, on which to decide the motion, the complaint, the deposition of Mr. H. S. Eustis, Baltimore Division Manager of defendant, taken by plaintiffs on December 6, 1961, the deposition of Mr. Harry Waller, president of plaintiffs, taken by defendant on the same day, and an affidavit of Mr. Harry Waller filed under the circumstances later described.

On February 2, 1962, when the motion came on for hearing, counsel for plaintiffs filed with the Court an affidavit made by one of them, purporting to indicate, in accordance with the provisions of Rule 56(f), 28 U.S.C.A., why plaintiffs were unable to show that there existed a genuine issue as to a material fact at that time, and asking that summary judgment be denied in order to enable plaintiffs to institute discovery proceedings by way of interrogatories, further depositions and admissions of fact, before the Court would consider the motion on its merits. This affidavit was substantially a redraft of an affidavit supporting a motion which had been presented to the Court in chambers on December 28, 1961, praying an indefinite continuance of the hearing on the motion.

The motion presented in chambers was denied, on the ground that an affidavit in compliance with Rule 56(f) was the proper procedure by which the continuance should be requested. Inasmuch as plaintiffs had had ample opportunity, since December 2, 1961, the date on which the first depositions were taken, to initiate interrogatories and further discovery and, since the failure of the plaintiffs to take such steps could only be explained by counsel at the time of the hearing on the ground that interrogatories could not be framed until "private discovery" by way of private investigators was completed—an explanation which could not be accepted by the Court—the affidavit was rejected as lacking in bona fides and made solely for the purpose of delay, and the motion for summary judgment argued and submitted. Subsequent to the hearing, plaintiffs served interrogatories upon defendant and filed with the Court the affidavit of Mr. Waller. The interrogatories came too late to demonstrate plaintiffs' bona fides in seeking to postpone decision of the motion. Accordingly, the Court extended the time for defendant to answer plaintiffs' interrogatories until the motion for summary judgment is decided. Rule 56(c) fixes the date before the hearing as the last day on which opposing affidavits may be filed, and indicates that in the usual case the motion must be decided on the record as of the date of the hearing on the motion. However, paragraph (e) of the Rule provides that, "The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits." Although leave has not been requested, the Court has permitted the Waller affidavit to be filed and has considered it in deciding the motion.

— I —

At the outset, the Court is cognizant of the statement in McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332, 339 (4 Cir. 1959) that, " * * * the trend of the courts [is] not to dispose finally of antitrust litigation upon the pleadings, without giving the plaintiff

full opportunity to formulate his charges," citing Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). In a case decided since the argument of the motion, Poller v. Columbia Broadcasting System, Inc., U.S., 82 S.Ct. 486 (No. 45, October Term, 1961, decided February 19, 1962), the Supreme Court said, " * * * summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." But, as the dissenters in the Poller case point out, Rule 56, by its terms, has equal application to all civil litigation and contains no exception for the sometimes vexatious and time consuming private antitrust cases. Since the Court has determined that unquestionably there is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law, Minnesota Mining & Mfg. Co. v. United States Rubber Co., 279 F.2d 409 (4 Cir. 1960), this would seem to be an appropriate case for even a sparing use of summary procedures.

■ Consistent with the pronouncements in Mandeville Island Farms v. American Sugar Co., 334 U.S. 219, 234–235, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); Klor's v. Broadway-Hale Stores, 359 U. S. 207, 211, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and Radiant Burners v. Peoples Gas Co., 364 U.S. 656, 81 S.Ct. 365, 5 L. Ed.2d 358 (1961), the problem before the Court, in determining the application of the Sherman Act, is not solely the mechanical one of whether the alleged restraint occurs in interstate commerce or in intrastate commerce. That determination is but a preliminary step. Equally significant is the broader question, whether a substantial effect upon interstate commerce can be found in the sum of the facts presented, because the current cases are clear that a restraint prohibited by the Act, and the injuries the restraint inflicts, are none the less remediable under the Act if the restraint arises in intrastate commerce but has a substantial effect on interstate commerce adverse to the policy of free competition which the Act is designed to safeguard. Cf. United States v. Yellow Cab Co., 332 U. S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

Plaintiffs own and operate 8 service stations in the State of Maryland, having annual sales in excess of $1,500,000.00 in dollar volume and 6,000,000 gallons in liquid volume, a monthly average of $123,333.00 and 500,000 gallons. Sales at the station adjacent to Middlesex yearly approximate $75,000.00 in dollar volume and 300,000 gallons in liquid volume, a monthly average of $6,250.00 and 25,000 gallons. These statistics must be viewed against the overall State · of Maryland figures of 2,500 to 2,700 service stations selling between 70,000,000 and 90,000,000 gallons of gasoline per month. The station adjacent to Middlesex began business by selling gasoline at the rate of 29,000–30,000 gallons per month, but after the first barrier was erected, volume sales dropped to 15,000–20,000 gallons per month. Each year for the last five years the station has lost approximately $20,-000.00. This loss includes the $1,000.00 per month rent plaintiff, A. & H. Transportation, Inc., pays to plaintiff, Savon Gas Stations No. 6, Inc., which leases the same from the owner at $750.00 per month and the taxes which A. & H. also pays on the property.

■ Plaintiffs acquire their gasoline locally. It is bought by plaintiff, A. & H. Transportation, Inc., or by Mr. Harry Waller, president of plaintiffs, trading as Arrow Oil Company, at terminals in the Metropolitan Baltimore area, and these terminals acquire the gasoline and other petroleum products from out of state sources. Delivery of the gasoline from the terminals to the station adjacent to Middlesex is effected by plaintiffs' trucks, leased trucks, private carrier or contract carrier. Plaintiffs buy directly from out of state sources various items of service station equipment, cans in which motor oil products are sold, motor oil and antifreeze. These latter items are shipped to the station in interstate com-

534

merce. While there are certain interstate aspects in the acquisition of the products plaintiffs sell, and the equipment to make sales and render services at retail, the decided cases indicate that the retail sale of gasoline, and related products, is intrastate in character. See Mitchell v. Livingston & Thebaut Oil Company, 256 F.2d 757 (5 Cir. 1958); Brenner v. Texas Company, 140 F.Supp. 240 (D.C., N.D., Cal.1956); Dial v. Hi Lewis Oil Co., 99 F.Supp. 118 (D.C., W. D., Mo.1951); Myers v. Shell Oil Co., 96 F.Supp. 670 (D.C., S.D., Cal.1951); Spencer v. Sun Oil Co., 94 F.Supp. 408 (D.C., Conn.1950); Brosious v. Pepsi-Cola Co., 155 F.2d 99 (3 Cir. 1946); Lewis v. Shell Oil Co., 50 F.Supp. 547 (D.C., N.D., Ill.1943).

■ While plaintiffs have alleged that defendant is an international, multi-corporate producer, refiner and marketer of gasoline and petroleum products, the incidence and substantiality of the alleged restraint are the matters for determination, not the corporate activities of defendant. Plaintiffs have variously accused defendant of thwarting "price competition" and unreasonably "restraining plaintiffs' trade and commerce," but the complaint makes it clear that plaintiffs have sole reference to Article 1A and its enforcement. Plaintiffs own and operate seven other service stations in Maryland, but the complaint fails to make a single allegation against defendant in regard to them.

Article 1A is completely local in effect. It relates solely to the three block area comprising Middlesex and is limited in time to the term of the defendant's lease. Its effect is not to prevent plaintiffs from operating their adjacent service station (there is free and complete access to Eastern Boulevard), but simply to deny their customers access to adjoining private property in accordance with the alleged oral right-of-way agreement. The limitation on plaintiffs' right to use adjoining private property was constructively known to them when they acquired the site for their station and entered into the alleged oral right-of-way,

Annotated Code of Maryland, Art. 21, §§ 1, 10; Ivrey v. Karr, 182 Md. 463, 34 A.2d 847 (1943), and plaintiffs elected to establish a service station, and thus to penetrate a marketing area, where, within a three block radius of the site they selected, there are at least ten other service stations, some of which were in existence prior to the Savon station, selling virtually every well-known brand of gasoline marketed in this area, including Esso, Socony-Mobil, Tidewater, Sun, Crown, Texaco, Atlantic and Sinclair, as well as Savon and Shell. Restrictive covenants like Article 1A are part of the familiar pattern of shopping center financing, as disclosed by the cases cited in part II hereof, where they are an inducement to attract the prime tenants required by professional lenders. In this case, the restrictive covenant is too limited in geographical scope to be vulnerable to attack under any authority which has been called to my attention.

Far from substantial, the effect of Article 1A and its enforcement on interstate commerce is incidental and inconsequential; hence, the jurisdictional requirements of the Sherman Act are not met.

— II —

■ There can be little question but that defendant's motion for summary judgment must be granted as to the second count of the complaint.

As before stated, that count seeks to recover damages and injunctive relief under Maryland law. The Maryland cases have carefully considered restrictive covenants like that contained in Article 1A of the lease and have upheld their validity, irrespective of the motive and purpose of their enforcement.

In the early case of Guerand v. Dandelet, 32 Md. 561 (1870), injunctive relief was granted to prohibit the breaching of an agreement ancillary to a lease, wherein the lessor covenanted not to compete, directly or indirectly, with the lessee's dyeing establishment within the City of Baltimore, on the ground that a partial restraint of trade is enforceable if its

scope is confined within the reasonable limits, even though its duration may be unlimited. Griffin v. Guy, 172 Md. 510, 192 A. 359 (1937), sustained the enforceability of a covenant contained in an employment contract that the employee would not compete within the Town of LaPlata and, thus, held the restraint reasonable in geographical scope, although indefinite in time.

Snavely v. Berman Brown, 143 Md. 75, 121 A. 842 (1923); Slice v. Carozza Prop. Inc., 215 Md. 357, 137 A.2d 687 (1958) and Glen Burnie Shopping Plaza v. Schreiber, 220 Md. 303, 152 A.2d 807 (1959) likewise uphold similar restrictive covenants. See also, Schmidt v. Hershey, 154 Md. 302, 140 A. 363 (1928); Belvedere Hotel Co. v. Williams, 137 Md. 665, 113 A. 335, 14 A.L.R. 622 (1921); Annotations 90 A.L.R. 1449 (1934); 46 A.L.R.2d 119, 198, et seq. (1956). The latest case, Md. Trust Co. v. Tulip Realty, 220 Md. 399, 153 A.2d 275 (1959), was one which would markedly impress itself on the owners of Middlesex, because the principals of Woodmoor Shopping Center enjoined from a breach of the covenant giving the exclusive right to conduct the only food market in a portion of the center, and the right to use certain parcels as parking areas in common with tenants of other stores in all of the Center, were the same persons who are the owners of Middlesex.

Article 1A is, by its terms, limited in time to the duration of the defendant's lease, a period shorter than the maximum valid under Maryland law. In geographical scope, it is considerably more limited than the restrictive covenants upheld in the Guerand and Griffin cases, supra. In the Tulip case (220 Md. p. 412, 153 A.2d 275) the law is made clear that the avowed motive and purpose of the parties seeking to enforce the restrictive covenant is immaterial, so that plaintiffs' argument that Tulip is inapplicable be-cause Middlesex "was an unwilling party to defendant's economic dominance" is without merit. Article 1A, moreover, is broad enough to restrict Middlesex from using or *permitting* the use of other portions of the center by others in competition with defendant, a prohibition unquestionably valid under Snavely, Slice and Tulip, supra.

— III —

From what has been said, it is unnecessary to pass upon defendant's contention that both counts are barred by limitations, but defendant would not be entitled to summary judgment because all of the material facts are not beyond issue.

Suit was filed October 27, 1961. The evidence as to the erection of the barriers is contained in Mr. Waller's deposition. There were three barriers, the first, consisting of wooden stakes or poles, erected in "late 1956," but removed by plaintiffs' employees as fast as they went up. There followed a concrete curbing, variously stated by Mr. Waller, president of plaintiffs, as put in place in February, 1957, or late 1957, but he wasn't sure. A second concrete curbing was installed in December, 1959 (according to the Waller deposition), or September, 1959 (according to the Waller affidavit), because Mr. Waller was informed by Middlesex's contractor that the first concrete curbing (the second barrier) was on plaintiffs' land, rather than the common line. What hiatus, if any, there was between the various barriers is not disclosed. Needless to repeat, precise dates cannot be determined, and were limitations the sole basis for the motion, it would be denied and the case set for the receipt of evidence.

Counsel for defendant may submit an order granting summary judgment for defendant with costs, on both counts of the complaint.