**Leonard W. SAPP et al., Plaintiffs,**

v.

**Richard E. JACOBS et al., Defendants.**

**No. S–CIV–74–14.**

United States District Court,
S. D. Illinois, S. D.

Feb. 20, 1976.

120

R. Gerald Barris, Springfield, Ill., Carroll J. Donohue, St. Louis, Mo., for plaintiffs.

R. G. Heckenkamp, George B. Gillespie, Springfield, Ill., John C. Mulgrew, Jr., Heyl, Royster, Voelker & Allen, Peoria, Ill., Alan L. Metz, Chicago, Ill., John R. Pusey, Peoria, Ill., John F. McClatchey, Cleveland, Ohio, Robert S. Allen, St. Louis, Mo., David N. Howarth, Springfield, Ill., for defendants.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

This cause arises upon a multi-count, civil complaint, grounded upon the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq., and upon Illinois substantive law. The cause is now before the court upon motions by the several defendants to dismiss the antitrust counts of complaint for the reason that subject matter jurisdiction is absent.[1]

The plaintiffs, who are Illinois citizens, are the owners of all beneficial interest in a real estate trust embracing 154 acres of land in the vicinity of the city of Springfield, Illinois. The defendants, Richard E. Jacobs, David H. Jacobs, Dominic Visconsi, R. F. Coffin, and Edward

---

1. The motion of defendant May for summary judgment rests upon the contention that subject matter jurisdiction is absent. That motion is deemed by the court to be a motion to dismiss.

H. Crane, all citizens of states other than Illinois, are partners, doing business as Springfield Joint Venture (hereinafter, collectively, "SV"). Defendant Paul Barker is a citizen of Illinois, who is engaged, *inter alia*, in the development of White Oaks Shopping Center at Springfield. Defendant Sears, Roebuck & Co., hereinafter "Sears," is a New York corporation, engaged, both inter-state and intrastate, in the merchandising of myriad lines of consumer goods through a large chain of retail outlets. Defendant May Department Stores Co., hereinafter "May," is a New York corporation which is likewise engaged, both interstate and intrastate, in the sale of consumer goods through a substantial number of retail outlets.

Of the ten counts of complaint, Counts II, VIII, IX and X are grounded upon the federal antitrust laws. The remaining six counts are grounded upon Illinois substantive law.

### Historic Perspective of Those Motions

The complaint had its genesis in the competing efforts between the plaintiffs and defendant Barker to develop a regional shopping center in the Springfield, Illinois, market area. The success of such a venture is conceded to depend upon the obtaining of occupancy commitments from major retailers, which success is then expected to promote lease agreements for mall shops, etc., from smaller and less prestigious retailers. In this case, all parties deemed Sears to be the key to success or failure. Ultimately, Sears decided to enter into an agreement with Barker to locate in his White Oaks Center. The alleged result was that plaintiffs were then unable to realize the expectation of development of a regional center upon the lands which they own.

2. At an earlier time when motions directed against the state law counts were before the court, it seemed apparent that there was reason to ponder the question whether federal jurisdiction was stated in the bare-bones antitrust counts. It also seemed possible that the bare-bones allegations might be fleshed out by substantive proof to bridge that seeming deficiency. Because the question was not presented to the court at that time, it was not then considered. The instant motions arise in a context which is quite different.

Following discovery and pre-trial procedures, the cause was scheduled for trial to commence on January 14, 1976. Up to and including the final pre-trial conference, there had been no challenge to jurisdiction to the antitrust counts by the defendants.[2]

Pursuant to this court's Standing Pre-Trial Order, the plaintiffs filed their pre-trial statement, which contained the statement of their theory of the case, as exemplified by the issues presented, and their statements as to the essential facts which they deemed provable and supportive of their right to judgment in their favor.

The May motion for summary judgment upon the antitrust counts against it was prompted by that factual statement by the plaintiffs. Thus, May took the position that all facts stated by plaintiffs, if true, do not provide a basis for federal jurisdiction to attach under the antitrust laws, that there remains no genuine issue as to any material facts, and that it is entitled to summary judgment in its favor. The subsequently filed motions by other defendants to dismiss the complaint stress the same factual statement, as well as all admissions and sworn materials before the court, for the position that such facts, assumed to be true, reveal that there is no subject matter jurisdiction under the antitrust laws.

The scheduled trial was continued pending disposition of the several motions on jurisdiction. Briefs have now been filed by all parties and oral argument has been heard. The cause is before the court upon the file as thus, historically, postured.

### The Complaint

All counts of the Complaint arise out of the same alleged, operative facts which are summarized as follows: At all

material times the plaintiffs were actively endeavoring to develop their land as a commercial shopping center. At the same time, the SV defendants were seeking to locate a shopping center in the vicinity of Springfield, and Barker was seeking to develop a shopping center upon lands which he owned or controlled, also in the Springfield area. On January 26, 1973, plaintiffs entered into two agreements with one Hahn-Newman Development Corporation, as follows:

a. A joint venture agreement for development of plaintiffs' site as a commercial shopping center; and

b. An agreement that plaintiffs had the option of terminating the joint venture agreement within thirty days of the date thereof if the plaintiffs found that Sears would not locate a retail department store in the shopping center project anticipated by that agreement.

In February, 1973, representatives of SV contacted plaintiffs, proposing to purchase 100 acres of the site for shopping center development, SV advised plaintiffs that they had a close relationship with Sears and that Sears would not locate in the center proposed to be developed by plaintiffs and Hahn-Newman. Plaintiffs exercised their option to terminate, and did terminate the Hahn-Newman agreement. On February 28, 1973, they entered into an agreement with SV for the sale to SV of 100 acres of the site for the sum of $2,000,000. Subsequently, both Sears and defendant May elected to locate retail outlets in Barker's proposed White Oaks Center. SV then refused to perform their contract for land purchase. Prior to the commencement of this suit, SV filed a suit in the Circuit Court of Illinois, at Springfield, to recover the earnest money paid under their contract with plaintiffs. Plaintiffs filed a counterclaim in that suit for breach of contract.

At the outset of their efforts at commercial development, plaintiffs' real estate was zoned in a residential classification. The real estate was rezoned for commercial development by the city of Springfield, with the proviso in the rezoning ordinance that the classification would revert to the residential classification unless commercial construction was commenced within a period of two years after the effective date of the amendatory ordinance. Finally, it is alleged that plaintiffs' real estate has a market value in excess of $20,000 per acre under a commercial classification, compared to a value of about $4,000 per acre under the residential zoning classification to which it has now reverted.

In the context of the antitrust counts, the complaint alleges that all of the defendants did conspire together to "deliver" Sears to the competing Barker development, and that as a result of that conspiracy, plaintiffs were prevented from developing their land for their proposed commercial purpose. It is further alleged that the restraint thus imposed did affect interstate commerce because "millions of dollars in goods and merchandise would be shipped in interstate commerce" annually to a regional center in the Springfield market area, and that the movement of such merchandise would involve the use of interstate carriers.[3]

In the context of the present motions, the complaint is deemed to include the allegations of all essential facts which plaintiffs state that they would prove and their definition of the interstate commerce effect as reflected in their answers to interrogatories.[4]

---

**3.** Alternative allegations that substantial goods would be shipped out of such a center annually and that merchandise would be sold therein to interstate travelers are now abandoned by the plaintiffs.

**4.** In their summary of the essential facts which they would prove at trial, plaintiffs stated:

a. That up to the present time, there is no regional shopping center located in the Springfield market area;

b. That the "Springfield market area" encompassed the city of Springfield, together with a surrounding area having a radius of from 40 to 50 miles in all directions from the city;

Since filing their statement of essential facts, plaintiffs have expanded their antitrust theory. Thus, they assert in their brief that they would produce evidence that they had been continuously engaged for some two years, up to and including April, 1973, in soliciting agreements from citizens of states other than Illinois for occupancy of their proposed shopping center.[5] Though they stated in their brief that their complaint had not relied upon "the construction aspects" of "the proposed shopping centers involved" as having any "supposed impact" on interstate commerce, they nevertheless asserted in oral presentation that such an impact did exist in the premises.[6] Those allegations are likewise accepted to complete the totality of flesh with which the bare-bones complaint is now adorned.

Solely for the purpose of considering these motions in that light, the court assumes the facts to be true, that the several defendants did conspire together as alleged in the complaint to thwart plaintiffs' efforts to develop a shopping center, and that that concerted action did preclude the fruition of the plaintiffs' plans. It also assumes, without so deciding, that such acts would be a violation of the Sherman Act if interstate commerce was either directly involved or substantially affected thereby.

It further accepts as true all other allegations of the antitrust counts embellished as above delineated. Such are summarized as follows: Plaintiffs' land remains undeveloped. They gave up their planned development when it became apparent that Sears and other major retail outlets would locate in White Oaks, and when SV renounced their purchase agreement. There are to date no regional shopping centers in the Springfield market area, though White Oaks is now under construction. That market area, as defined by plaintiffs, lies wholly within the state of Illinois. The White Oaks Center, when opened, will be anticipated to generate a substantial volume of retail sales, and a very substantial part of the merchandise sold will reach the center and that market from other states through instrumentalities of interstate commerce. For a period of time extending until April, 1973, plaintiffs were actively negotiating with potential retail tenants in states other than Illinois, with the object of obtaining commitments for their occupancy of plaintiffs' proposed center.

c. That the competing development, White Oaks Shopping Center, "when it opens," is anticipated to house five major retail establishments, including Sears and May, in addition to appended mall shops;

d. That gross retail sales at White Oaks can reasonably be anticipated to exceed $50,-000,000 annually when the center is opened; and

e. That in excess of 50% of all merchandise retailed at White Oaks will reach the center through interstate commerce, transported by interstate carriers.

Plaintiffs, by their answers to interrogatories, defined the commodities and market in which they alleged restraint of interstate commerce as follows:

"The market in which trade was restrained was Springfield, Illinois, and the area forty to fifty miles in all directions from it. The trade restrained was: (i) the retail trade in all classes of merchandise; (ii) department stores and shopping centers; (iii) the furnishing of store space and facilities in a shopping center to commercial occupants thereof."

5. Defendant Barker argues that plaintiffs cannot claim that they were so engaged up until April, 1973, because they had voluntarily removed themselves from the development effort on February 28, 1973, when they entered into a contract with SV to sell their real estate outright to those defendants. Though there be seeming logic in that argument, the complaint must nevertheless be construed as alleging that plaintiffs' development efforts did thereafter continue.

6. To some degree that theory is contradictory of a basic theory of complaint; namely, that an object of the conspiracy was to cause Sears to reject plaintiffs' proposed center, that the conspiracy did achieve that objective, and that plaintiffs were thereby precluded from realizing their development efforts. Thus, plaintiffs' basic theory was that development could not be successful without Sears as a tenant, and that only one of the two competing sites could be developed, in any event.

To some degree, those accepted facts partake of admissions by plaintiffs against their own interest. Though that course is doubtless justified in any event, this court's Standing Pre-trial Order charges each party, in advance of trial, to file a concise summary of the essential facts which such party expects to prove at trial. It was incumbent upon the plaintiffs to state all essential facts, including facts reflecting the existence of the court's jurisdiction. It is assumed that the plaintiffs did state all essential facts which they would prove and that they vouch for the veracity of the facts which they do state. The effect of the standing order notwithstanding for purposes of this motion, the court has not precluded the subsequent, factual embellishment of the statement of "essential facts" which plaintiffs filed.

The file herein now reflects a status of claim at which the bare-bones complaint merely hints; namely, that any effect upon interstate commerce in the premises must derive from one or both of two factual expectations, to-wit:

a. The ultimate development, intrastate, of a regional shopping center, or

b. The fact that a large proportion of the retailed merchandise anticipated to be marketed at such a center will in the future reach that market through channels of interstate commerce.

### The Propriety of These Motions

Plaintiffs do suggest the untimeliness of these motions, in view of the substantial expense and effort thus far devoted to discovery and trial preparation. However, their suggestion is tempered by their necessary acceptance of the hornbook rule that subject-matter jurisdiction cannot be created by the consent of parties litigant and the necessary corollary thereto that the question can be raised at any state of litigation.

Though the statement of that rule suffices to dispose of any suggestion as to timeliness, another consideration must be recognized for its effect upon timing in this case. The decision in *A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Ass'n.*, 484 F.2d 751 (7 Cir. 1973), may well be interpreted to discourage or, perhaps, prohibit a motion to dismiss a "bare-bones" complaint in any antitrust suit. Regardless of the efficacy to the last observation, it does appear, in the light of *Cherney*, that the discreet practitioner might now well await the fleshing out of the notice complaint by facts developed through discovery before he would ever assert the jurisdictional question.

■ Moreover, one is left with the impression, from reading the myriad cases, that there is in this judicial sphere a considerable degree of court-generated confusion between the substantive question of Sherman Act violation and the procedural question of Clayton Act jurisdiction. One recent example of that phenomenon is presented by the opinion in *Evans v. S. S. Kresge Co.*, 394 F.Supp. 817 (W.D.Pa.1975), which, in turn, merely reflects the confusion of other courts at other times. There is reflected a seeming failure to differentiate the necessary distinction between the minimum factual allegations necessary to invoke a court's jurisdiction and the quantum of proof required to prove a substantive violation when that jurisdiction is invoked. One result of such confusion, which is inherent in the present context, and which threads its way into some reported decisions, is the wholly untenable argument by the plaintiffs that the jurisdictional question must be presented to the jury as the trier of fact. The question of its own jurisdiction can be decided only by the court. *Gilbert v. David*, 235 U.S. 561, 35 S.Ct. 164, 59 L.Ed. 360 (1915); *Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co.*, 469 F.2d 416, 418 (5th Cir. 1972). Conceding the existence of the power to act, then the trier of fact is the competent body to decide the substantive issues.

Unquestionably, the substantive and jurisdictional issues may frequently be so factually interwoven in an antitrust case that a consideration of all available evidence may be necessary before either is-

sue can be decided. In such event, decision of the jurisdictional question must still remain a function of the court. This court considers that that consideration is the rationale of *Cherney*. If, instead of resolving disputed facts to dismiss a complaint, the trial judge had directed a verdict upon his determination at the close of the evidence that jurisdiction was lacking, would the Court of Appeals have reversed the decision? That supposed result seems unlikely.

Thus, it is not deemed that the *Cherney* case supports the statement in *Gateway Associates, Inc. v. Essex-Costello, Inc.*, 380 F.Supp. 1089, 1974–2CCH Trade Cases 75, 231 (N.D.Ill.1974), that the law of the Seventh Circuit now seems to require that a trial court must conduct a trial upon the merits of every antitrust case before it can even consider the question whether it does have jurisdiction to conduct the trial.[7]

Because heavy reliance is placed by plaintiff on *Cherney*, and because it is felt that that case is clearly distinguishable from this, analysis of *Cherney* is undertaken here. The complaint there alleged that the defendants, including a large interstate association of refuse collectors and two suppliers of refuse equipment, had conspired together to monopolize the refuse disposal market in the area of Chicago, Illinois, and in closely adjacent areas of Indiana and Wisconsin. It alleged that such collusive activities included price fixing, refusal to deal with the plaintiffs, market allocations and group boycotts. 484 F.2d at 752, n. 1. Motions for summary judgment were filed by the defendants. Such motions were supported by affidavits and opposed by counter-affidavits filed by the plaintiffs. Ultimately, the court construed the motions to be motions to dismiss. It dismissed the complaint for lack of subject matter jurisdiction. In

reversing that judgment, the court said that it had involved the decision of disputed questions of fact which could not be decided on a motion to dismiss. *Ibid.* at 755–758. In that context the court distinguished the *Lieberthal* case, *infra*, for the reason that that decision rested upon *"uncontested"* allegations of fact (emphasis in court's opinion) which the court accepted as true, not upon the resolution of disputed questions of fact. *Id.* at 756. Concluding, the court said that, upon the record before it, "we must here * * * consider all evidence tendered in support of the plaintiffs' asserted cause of action, to determine if under any possible theory they have plead facts" sufficient to resist either a motion for summary judgment or a motion to dismiss for lack of jurisdiction. And, further, that, "on the record before us," the motion should not have been granted "because it required a weighing of facts disclosed in pleadings and affidavits * * *." *Id.* at 759–769.

█ Despite plaintiffs' protestations to the contrary, there are no material disputed fact questions before the court in this cause. They do allude to evidence which they can bring to bear in support of their several theories of complaint. That allusion is immaterial in light of the fact that the court does accept as fact every ultimate fact which they assert that they would prove, including the belated, shifting-sands fact that the construction of the plaintiffs' proposed center, had it been realized, would have required the interstate shipment of building materials having value measured in millions of dollars. Thus, the bare-bones complaint is deemed to be fleshed out by all factual premises which plaintiffs now assert they can prove. The motions are considered in that context.

█ The Sherman Act does not reach every conspiratorial action which

---

7. The court said: "The law of this Circuit now seems to require the district courts to *try* antitrust cases on the merits before they may determine whether they even have the jurisdiction or power to do so." 1974–2CCH Trade Cases, at 92, 541. (Emphasis by the court.)

Because of the emphasis by the court, that statement can be construed as a left-handed criticism of *Cherney*, rather than an interpretive statement of judicial opinion. In either event, the statement is deemed to be an unwarranted interpretation of *Cherney*.

does have the effect of restraining trade and commerce. What it does condemn are those acts which occur within the flow of interstate commerce, or which, though they occur locally and intrastate, do substantially affect interstate commerce. *E. g., Burke v. Ford*, 389 U.S. 320, 321, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); *Las Vegas Merchant Plumbers Association v. United States*, 210 F.2d 732, 739 (9th Cir. 1954), *cert. denied*, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645; *DeVoto v. Pacific Fidelity Life Insurance Company*, 516 F.2d 1, 4 (9th Cir. 1975). In the context of acts "affecting commerce," as opposed to those "in commerce," the critical test is whether the relationship of such acts to interstate commerce is too tenuous to warrant federal control. *Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Ass'n., supra* at 759.

*Plaintiffs' "In Commerce" Theory*

■ Plaintiffs contend that their activities were "in interstate commerce" because they were engaged in the activity of soliciting potential tenants, some of whom are headquartered outside the state of Illinois. In that regard, they refer to the fact that both Sears and May are New York corporations and that both engage in substantial interstate business.

That premise must fail. Plaintiffs' activities were geared to the development of real estate in Illinois for the purpose of providing a regional center, through the facilities of which persons other than themselves would engage in the intrastate retail sale of merchandise. That wholly local activity does not become an activity "in interstate commerce" simply by reason of the fact that they did solicit prospective tenants from other states.[8]

Several courts which have considered the question whether intrastate real es-

tate transactions are within the purview of Sherman Act protection have held that that Act does not apply. *Marston v. Ann Arbor Property Managers Association*, 422 F.2d 836 (6th Cir. 1970), *cert. denied*, 399 U.S. 929, 90 S.Ct. 2244, 26 L.Ed.2d 796, grew out of an alleged conspiracy to monopolize residential property rentals in the vicinity of Ann Arbor, Michigan. *Cotillion Club, Inc. v. Detroit Real Estate Board*, 303 F.Supp. 850 (E.D. Mich.1964), alleged a conspiracy to monopolize real estate sales in Detroit, Michigan, and vicinity. *Saint Anthony-Minneapolis, Inc. v. Red Owl Stores, Inc.*, 316 F.Supp. 1045 (D.Minn.1970), involved a claim that restrictive lease covenants which barred the opening of a competing retail establishment in a desired location violated the Sherman Act. *Savon Gas Stations No. 6, Inc. v. Shell Oil Company*, 203 F.Supp. 529 (D.Md.1962), likewise arose out of a restrictive covenant in a lease which denied to the plaintiff direct access from its gasoline station to an adjacent shopping center parking lot. In each of those cases the court held that the transaction related to land was essentially local, not interstate, and that it had no substantial effect upon interstate commerce. *Cf. Lieberthal v. North Country Lanes, Inc.*, 332 F.2d 269 (2d Cir. 1964), which arose out of an alleged conspiratorial breach of a contract between a local developer and an interstate chain of bowling alleys. The court did not consider the question of the contract as such.

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) relied upon by plaintiffs, involved a situation which was substantially different from that involved in both the cases cited above and the case at bar. The critical thrust of the complaint was that there existed a conspiracy to fix prices throughout Fairfax County, Virginia. The critical issue was the ques-

---

8. Interestingly enough, in this context plaintiffs summarize their statement of essential facts as the facts that Sears and May are "interstate" businesses, and that they, the plaintiffs, "were actively engaged in soliciting po-

tential tenants up to April, 1973." Neither the complaint nor the essential facts stated attribute any interstate character to those pre-April activities.

tion whether there existed a factual nexus with the Act.

The complaint alleged that all attorneys within the area were parties to an agreement to fix minimum prices for the examination of titles to real estate. That agreement was exemplified by a schedule of minimum fees which had been adopted by a local bar association, and which, in turn, was supported and enforced by the agency of the Virginia State Bar. Factually, it appeared that a substantial part of the real estate transactions in that county were interstate in nature, in the sense that the financing of a substantial volume of the total transactions came from outside the state, from either federal agencies or private lenders.

Considering the argument that such legal services were wholly local, the Court characterized the fee schedule as "a classic illustration of price fixing." *Ibid* at 781–783, 95 S.Ct. at 2011. The Court said that the argument misconceived the nature of the transactions involved, saying that the transactions which created the need for the legal services were in many cases interstate transactions. It held that the local service was only one integral part of the interstate commerce thus involved. *Id.* at 783–785, 95 S.Ct. 2004. In that regard, the Court said, "Given the substantial volume of commerce involved, and the inseparability of this particular legal service from the interstate aspects of" the real estate transactions encompassed therein, an effect on interstate commerce was shown. *Id.* at 785, 95 S.Ct. at 2012.

Significantly, it appears from the Court's factual recital that many transactions involved persons resident outside the state of Virginia, but that fact appears to have no bearing upon the Court's decision. It held that the transactions were "in" interstate commerce only because of the substantial volume of interstate financing.

Similar considerations were present in *Gateway Associates, Inc. v. Essex-Costello, Inc., supra,* in which the court denied a motion to dismiss an antitrust complaint which was grounded upon an alleged conspiracy to monopolize real estate sales in an area of Northern Illinois, situated in close proximity to the state of Wisconsin.

No considerations of like import affect the case under consideration. In fact, it is extremely questionable whether the complaint, including all its subsequently added flesh, can be construed to allege that any interstate commerce character attached to plaintiffs' attempts to negotiate leases. The question need not be further pursued. No case is found which has held that negotiations between citizens of different states for a contractual agreement which would be performable intrastate, without more, is a transaction which is either "in" interstate commerce or which substantially affects such commerce. A necessary corollary of the plaintiffs' argument is the conclusion that every contract between citizens of different states is protected by the provisions of the Sherman Act. If such a nebulous scope is to be engrafted upon the antitrust laws by judicial interpretation, that decision must come from a court possessed of a greater power and wisdom than that with which this court is endowed.

*The "Effect on Interstate Commerce" Theory*

The court must also conclude that the complaint, as embellished by all essential facts which plaintiffs represent that they can prove, shows conclusively that the defendants' acts do not have any substantial effect upon interstate commerce.

Intrastate activities have been condemned as violative of the antitrust laws, when it has appeared that such activities did impose a substantial burden on interstate commerce. *E. g., Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); *Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

In *Burke,* the liquor wholesalers in the state of Oklahoma entered into an agreement which adopted a statewide division of the liquor market among themselves, both territorially and as to brand names of liquors made available in the various territories. No liquor was distilled in the state, and all entered the state through interstate commerce. In condemning the practice, the Court said that the activity was not "in" interstate commerce, but that it was within the purview of the Sherman Act because it did substantially affect such commerce. That substantial effect was found to exist for two reasons. The first was that the territorial division "almost surely" resulted in fewer sales to retailers and fewer purchases from the out-of-state suppliers. The second was that the brand-name division within the state reduced the availability of wholesale markets to the distillers who were engaged in interstate commerce. 389 U.S. at 321, 322, 88 S.Ct. 443.

The *Mandeville* case involved a conspiratorial arrangement among sugar beet processing companies fixing the prices which they would pay to sugar beet growers. Though the immediate impact of that arrangement affected only Northern California farmers, and, thus, was intrastate only, the unique circumstances involved imbued the arrangement with an interstate commerce significance.

Sugar beets can neither be stored nor shipped for substantial distances without processing. Producers had two alternatives. They either grew beets under a contract with one of the three processors who were located in the geographic area, or they did not grow beets. After harvest, the beets were processed, intrastate. Substantially all of the raw sugar thus produced then entered the stream of interstate commerce. The three processors, who, in the aggregate, held a monopolistic position, were all parties to the price fixing agreement.

Against that background, the Court said that the production and processing stages could not be divorced from the interstate commerce stage without considering the economic continuity and effect of the intrastate stages upon the interstate stage. 334 U.S. at 229, 68 S.Ct. 996. Further, the Court said that the conspiracy, though localized in its immediate effect, was condemned by the Sherman Act because the conduct was just one inseparable element of a total program which depended for its success upon activities in interstate commerce. That effect being demonstrated, it was held to be immaterial at which precise stage the illegal restraint occurred. *Ibid* at 236–238, 68 S.Ct. 996.

Other cases upon which plaintiffs principally rely grow out of a similar background of fact. In each, though the primary impact of a conspiratorial act was local, there were existent facts which imposed a substantial effect on interstate commerce. *E. g., Lehrman v. Gulf Oil Corporation,* 464 F.2d 26 (5th Cir. 1972), cert. denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665; *Battle v. Liberty National Life Insurance Company,* 493 F.2d 39 (5th Cir. 1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807; *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48 (3d Cir. 1973); *Rasmussen v. American Dairy Association,* 472 F.2d 517 (9th Cir. 1972). Neither those cases nor any other found have recognized the existence of Sherman Act application in the absence of factual demonstration that there was substantial impact upon some protected element of interstate commerce.

The crux of the issue presented is epitomized by the language contained at page 20 of plaintiffs' brief, the thrust of which is summarized as follows. The defendants acted with a purpose to monopolize "the regional shopping center business in the Springfield" market; there will be no competitor to the White Oaks Center and "prospective tenants of a regional shopping center in said area" have had to turn to White Oaks. There is no suggestion that White Oaks is an instrumentality in interstate commerce. In what, then, have plaintiffs been restrained? It seems clear from their statement of position, above summarized,

and from the allegations of fact which they have made, that they have been restrained only in their desire to sell or lease, and their prospect for the sale or leasing, of real estate in Springfield, Illinois. If that restraint has any substantial effect upon interstate commerce, that effect is neither pointed out to the court nor perceived by the court.

*Plaintiffs' Building Material Theory*

■ At the outset, the court accepts the fact that had the plaintiffs' plans been realized, such plans would have necessitated the interstate movement of a very substantial volume of building material.

However, that accepted fact is not determinative of the issue. In its well-reasoned opinion in *Lieberthal v. North Country Lanes, Inc., supra,* the Court of Appeals for the Second Circuit determined that the fact that a conspiratorial abridgement of a contract, which would have led to the interstate transportation of building materials and equipment, did not have any substantial effect upon interstate commerce. The court characterized such interstate activity as a "one-shot" affair which could not be held to convert the proposed venture into an interstate activity. 332 F.2d at 272. The rationale of the court was that the interstate movement of such material and equipment was incidental to the operation of an intrastate business.

The *Lieberthal* rationale was followed in *Sun Valley Disposal Co. v. Silver State Disposal Co.,* 420 F.2d 341 (9th Cir. 1969). In *Page v. Work,* 290 F.2d 323 (9th Cir. 1961), the court said that there was no Sherman Act impact in any "local restraints applied at a local level to a product which never enters into the flow of interstate commerce."

In this context the plaintiff argues that *Lieberthal* is distinguishable in the fact that it involved only one bowling alley, whereas the instant case involves the far greater quantum of materials which would be used in construction of a regional shopping center. It is certain that quantum considerations do enter into "affecting interstate commerce" decisions, but an attempt at quantum distinction is too simplistic in the present context. As *Cherney* suggests, a "de minimus" impact upon interstate commerce will not support a civil antitrust complaint, whereas such a complaint is sustainable upon allegations and proof of a "substantial" impact.

As the court views this cause, quantum considerations have no bearing upon it. In the first instance, the court believes that *Lieberthal* is a sound decision and that quantum considerations do not enter the picture when a court is dealing with only the fact of the shipment into the state of materials for wholly intrastate construction of real estate improvements. The second instance is a corollary of the first, namely, that quantum considerations become important only in relationship to commodities produced intrastate, which do, as such, become a part of the stream of interstate commerce. Are the courts, through interpretation of the Sherman Act, to convert the construction of every residence, every business premises, every apartment building and every shopping center into an interstate venture simply because construction materials do move in interstate commerce? In this court's view, that is a Pandora's box of federal restraint which Congress never intended to open. Moreover, if that congressional intent be deemed to exist, that fact might raise very serious constitutional issues.

In fact, plaintiffs concede by their complaint that there is no restraint upon interstate commerce. They allege that their development efforts were pursued until 1973 when two events occurred— Sears signed with Barker for a White Oaks location, and the SV defendants abrogated their contract with plaintiffs for the purchase and development of a part of the plaintiffs' land. Their whole theory of complaint is geared to the premise that without Sears as a committed tenant, development of a regional shopping center in the Springfield market was not feasible. They operated

upon the theory that their efforts would succeed or fail, depending upon a decision by Sears. The premises preclude the feasibility of competing regional centers. Thus, from the outset of plaintiffs' competitive efforts against Barker, any contemplated interstate movement of building materials was restricted to that material which the construction of one center would require. The court is at a loss to understand in what manner interstate commerce is restricted at all, especially in view of the plaintiffs' statement that the White Oaks venture is substantially more ambitious in the sense of total leasable space, or saleable space, and in construction cost, than was the venture which the plaintiffs initially envisioned.

The court is cognizant of the fact that the interstate movement of construction materials may, in a proper case, have a Sherman Act impact. *E. g., United States v. Finis P. Ernest, Inc.,* 509 F.2d 1256 (7th Cir. 1975), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124, 44 U.S.L.W. 3229. There the court held that an alleged criminal conspiracy to rig bids upon contracts for construction of the public facilities contained the requisite Sherman Act nexus because of the impact of that price-fixing scheme upon the interstate commerce in construction materials necessary for such projects. The bid rigging itself was deemed to have the effect of excluding certain materials and suppliers from competition in the interstate market. There is no such picture here. The uncontested facts of the instant case are too tenuously relat-

ed to interstate commerce to invoke federal jurisdiction.

### Plaintiffs' Retail Sales Theory

Plaintiffs' theory of jurisdiction, attaching by reasons of the anticipated substantial volume of retail sales which the ultimate development of White Oaks is anticipated to generate, is novel in two respects. First, it relies upon a prospective effect upon interstate commerce which will not occur until some unfixed time in the future.[9] Secondly, in light of the fact that plaintiffs are not, within the context of complaint, engaged in retail merchandising, their assertion of their injury must be vicariously tied to an anticipated prospective effect which will fall upon persons other than themselves. No case is found which has sustained antitrust jurisdiction upon a like premise.[10]

It is difficult to conceive of an effect operating upon that interstate commerce which relates to the retail selling of goods under these circumstances in which the facilities for such retail sales do not, in fact, now exist. There is the estimated, potential, gross retail sales volume which White Oaks is expected to generate, but there is no suggestion that such volume would be lessened or otherwise affected by any state of facts claimed by the plaintiffs to exist. It is also suggested that the factual premises will, when White Oaks becomes an operative market place, deprive the consuming public of shopping at a center upon plaintiffs' land, or of the right to choose between competing centers. Again, the

9. The argument of certain of the defendants that there can be no effect either alleged or shown because White Oaks may never become an operative venture is untenable. The fact is that White Oaks is under construction. The further fact is that Sears, May, and others are ready to assume occupancy whenever the advancement of construction permits. It must be realistically assumed that the business of retail selling on the White Oaks premises will become a matter of operative fact at a time in the future. As May has candidly stated, in effect, it will be engaged in such sales and it expects that activity to begin in 1977.

10. There was present in every case of which the court is aware an operative and ongoing engagement of the plaintiff in the particular field of commerce, with the exception of cases exemplified by the *Lieberthal* and *Red Owl* cases, in which it was alleged that a conspiratorial activity had prevented the plaintiff from entering an intended engagement in such commerce. No case is either cited to or found by the court in which a complaint has rested upon a theory that the plaintiff was injured by an alleged unlawful activity which would have an impact upon a business in which he was neither engaged nor intending to engage.

court can only divine, and it is in no sense apparent in what manner and to what degree, if any, interstate commerce might be affected thereby.

Assuming for present purposes that proposed and projected retail activities which have not achieved fruition may ever be considered within the antitrust context, those allegations of sales volume and interstate commerce volume cannot aid this complaint. Neither the wholesale sale, *Burke v. Ford, supra*, 389 U.S. at 321, 88 S.Ct. 443, 19 L.Ed.2d 554, nor the retail sale of merchandise, intrastate, after such merchandise has left the stream of interstate commerce, *Evans v. S. S. Kresge Company, supra*, 394 F.Supp. at 836; *Saint Anthony-Minneapolis, Inc. v. Red Owl Stores, Inc., supra*, 316 F.Supp. at 1048; *Savon Gas Stations No. 6, Inc. v. Shell Oil Company, supra*, 203 F.Supp. at 534, is, per se, within the purview of the Sherman Act. Restraints imposed at those levels can give rise to a cause of action only if such restraints are coupled with other factual considerations which reveal that they do substantially affect interstate commerce.

Again, assuming the same premises and scope of the Act, and accepting the estimates of more than $50,000,000 anticipated retail sales volume, and of more than 50% of such merchandise reaching the ultimate retailers through interstate commerce, and assuming that the consuming public would be expected to be in some manner touched by those operative facts, plaintiffs' assertion of a jurisdictional base becomes wholly nebulous. In this regard, they espouse a position which is deemed to be a patent misconstruction of Section 4 of the Clayton Act. 15 U.S.C. § 15.

A brief summary of the opposing views of the parties places the matter in perspective. Defendants argue that the plaintiffs, within the context of this complaint, are engaged in the wholly intrastate business of the development and enjoyment of real estate, not in the business of retail selling, and that they cannot create a jurisdictional basis for complaint upon the fact that the eventual operation of White Oaks will involve retail sales by others of merchandise received by such others in interstate commerce. Plaintiffs characterize that argument as "wholly groundless," stating that there is no provision of the antitrust statutes "from which it may be implied" that a party lacks standing under the Clayton Act to sue for injury arising out of an illegal restraint upon "a line of commerce other than that in which he is engaged."

Their argument rests upon the following premises. First, the actions of the defendants imposed a restraint upon plaintiffs' efforts to develop their land. Second, that one necessary effect of that restraint will limit prospective lessors of mall space to dealing with White Oaks only. Third, that mall shopping by the purchasing public in the market area will be limited to shopping at White Oaks. Fourth, that it must be presumed that the limitation imposed upon the purchasing public will have an effect on interstate commerce. Fifth, that it follows from those four premises that plaintiffs have suffered a restraint which does affect interstate commerce.

It is obvious that the burden, if any, which would arise from the fact that White Oaks will be the only available shopping center, falls upon the consuming public and, possibly, upon retailers who are in the market for mall space in the market area. The restraint of such burden cannot descend as a vicarious mantle around the plaintiffs to convert a presumed injury to other persons into an injury to the plaintiffs in their use and enjoyment of real estate.

The court is aware of no case in which jurisdiction was grounded upon the fact of injury to persons other than the party who made the complaint. The statement quoted in *Mandeville* that the Act "is comprehensive in its terms and coverage," 334 U.S. at 236, 68 S.Ct. at 1006, cannot be construed to support plaintiffs' position. That observation was made by the Court in obvious reference to the fact that the restraint with which the Court dealt was wholly localized in its

immediate effect. However, the parties plaintiff were those persons who were directly injured by that restraint. *Mandeville* can only be construed as saying that a restraint which is localized in its immediacy is nevertheless within the purview of the Sherman Act if it is shown to be one inseparable stage of an essentially interstate venture.

Conceivably, in a proper case, a jurisdictional basis for a suit might reside in a person who is, only incidentally, injured by an act which mainly affects persons other than himself. But in the view of this court, a complaint would have to allege that the complainant was directly injured by the operation of such incidental effect.

The court has, nevertheless, herein considered plaintiffs' position based upon the relationship of interstate commerce to the eventual retail activity at White Oaks. Even so, this complaint when fleshed out for all asserted theories, with all asserted facts admitted, does not set forth any basis for federal antitrust jurisdiction.

In summary, the asserted facts when uncontested require the conclusions that plaintiffs' activities in the premises were not "in" interstate commerce, and that any effect of the defendants' acts upon interstate commerce is too tenuous and remote to invoke the court's jurisdiction. It has been aptly observed that most localized activity does have some remote effect upon interstate commerce, but that some " 'de minimis' factor must intervene or federal regulation is boundless." *Rasmussen v. American Dairy Association,* 472 F.2d 517, 526 (9th Cir. 1972), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003.

For the reasons stated, Counts II, VIII, IX, and X, inclusive, are dismissed for want of subject matter jurisdiction.

### The State Law Counts

■ A necessary result of the premises is that all counts of the complaint grounded upon state substantive law must also be dismissed, because complete diversity of citizenship does not exist.

Plaintiffs suggest, in this context, that the court's prior order which denied motions to dismiss those counts resolved the jurisdictional issue thereto related. That premise is untenable. The prior order was entered within the context of the assumption that federal jurisdiction did exist under the antitrust laws. The state counts arose out of the same operative facts which led to the federal complaint. In the light of the facts, as then assumed to be true, the court held that the state counts had a proper jurisdictional basis under the doctrine of pendent jurisdiction. It is now evident and determined that the federal jurisdiction at that time assumed does not exist. Pendent jurisdiction cannot exist in a vacuum. Given the conceded want of complete diversity of citizenship and the absence of federal jurisdiction under the antitrust laws, the court can have no jurisdiction over the counts grounded in state law.

Accordingly, IT IS ORDERED that the complaint herein is DISMISSED for want of jurisdiction, without prejudice to any cause of action in an appropriate forum.